No. 13-3264
Consolidated with Nos. 13-3462, 14-2591 and 14-2602
Cross Appeal No. 14-2495

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

IN RE:
SOUTHWEST AIRLINES VOUCHER LITIGATION

ADAM J. LEVITT and HERBERT C. MALONE,
individually and on behalf of all other similarly situated,
Plaintiffs-Appellees,
Cross-Appellants,

v.

SOUTHWEST AIRLINES COMPANY,
Defendant-Appellant,
Cross-Appellee.

APPEALS OF: GREGORY MARKOW and ALISON PAUL,
Objectors-Appellants,
Cross-Appellees.

---

On Appeals from the United States District Court for the Northern District of Illinois,
No. 1:11-cv-08176, Trial Judge Matthew F. Kennelly

---

Opening Brief of Appellants Gregory Markow and Alison Paul,
With Required Short Appendix

---

CENTER FOR CLASS ACTION FAIRNESS
Theodore H. Frank
1718 M Street NW, No. 236
Washington, D.C. 20036
(703) 203-3848
*Attorneys for Appellant Gregory Markow* (13-3264, 14-2591)

LAW OFFICES OF DARRELL PALMER PC
Joseph Darrell Palmer
2244 Faraday Avenue, Suite 121
Carlsbad, California 92008
(858) 215-4064
*Attorney for Appellant Alison Paul* (13-3462, 14-2602)

**CIRCUIT RULE 26.1    DISCLOSURE STATEMENT**

Appellate Court No: 13-3264

Short Caption: In re Southwest Airlines Voucher Litigation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [✔]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Gregory Markow

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Center for Class Action Fairness

Williams Montgomery & John (district court local counsel)

(3)    If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

    N/A

Attorney's Signature: /s/ Theodore H. Frank            Date: 10/1/2013

Attorney's Printed Name: Theodore H. Frank

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** X    **No** _____

Address: Center for Class Action Fairness, 1718 M Street NW, No. 236, Washington, DC 20036

Phone Number: (703) 203-3848            Fax Number: N/A

E-Mail Address: tedfrank@gmail.com

rev. 01/08 AK

## CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: 13-3462

Short Caption: In re Southwest Airlines Voucher Litigation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [   ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Alison Paul

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Law Offices of Darrell Palmer PC

(3)    If the party or amicus is a corporation:

    i)   Identify all its parent corporations, if any; and

        N/A

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

        N/A

Attorney's Signature: s/ Joseph Darrell Palmer        Date: 12/11/2013

Attorney's Printed Name: Joseph Darrell Palmer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes  X  No

Address: 2244 Faraday Avenue, Suite 121

        Carlsbad, CA 92008

Phone Number: 858-215-4064        Fax Number: 866-583-8115

E-Mail Address: darrell.palmer@palmerlegalteam.com

rev. 01/08 AK

ii

# Table of Contents

Rule 26.1 Disclosures ...................................................................................... i

Table of Contents ........................................................................................... iii

Table of Authorities ....................................................................................... v

Statutes and Rules ......................................................................................... xiv

Jurisdictional Statement ................................................................................ 1

Statement of the Issues ................................................................................ 4

Statement of the Case ................................................................................... 6

      A.    Plaintiffs sue................................................................................... 6

      B.    The parties settle. ........................................................................ 6

      C.    Markow and Paul object. ............................................................. 7

      D.    Fairness hearing. .......................................................................... 9

      E.    The district court approves the settlement and reduces the fee award. .... 10

Summary of the Argument ............................................................................. 12

Standard of Review ......................................................................................... 14

Argument .......................................................................................................... 15

I.     Settlement approval cannot stand because this is a "one-sided" settlement that benefits class counsel at the expense of the class: the unopposed and segregated fee and incentive awards and the likely disproportion between class recovery and attorney recovery render it unfair. .................................................. 15

      A.    Reversion of unawarded fees to Southwest Airlines exacerbates the unfairness caused by the clear-sailing agreement........................................ 17

      B.    The district court erred as a matter of law in failing to determine the actual class benefit; the settlement's proposed $3 million to attorneys is likely disproportionately high relative to the amount the class will enjoy in coupons, and is therefore *per se* unfair......................................................... 21

II.    The district court committed reversible error in approving a settlement and fee request that did not comply with 28 U.S.C. § 1712(a)............................................. 33

      A.     The lower court erred interpreting § 1712......................................................... 34

      B.     The lower court's use of legislative history was improper and incorrect.  41

III.   Markow did not waive his objections to settlement approval. ............................... 43

IV.  An undisclosed conflict of interest should have precluded class certification. .... 47

Conclusion ............................................................................................................................. 48

Statement Regarding Oral Argument ................................................................................. 50

Certificate of Compliance  with Fed. R. App. 32(a)(7)(C) and Circuit Rule 30(d) ............ 51

Proof of Service..................................................................................................................... 52

# Table of Authorities

<u>Cases</u>

*Abrego v. Dow Chemical Co.,*
　443 F.3d 676 (9th Cir. 2006) ........................................................42

*Anderson v. AB Painting & Sandblasting, Inc.,*
　578 F.3d 542 (7th Cir. 2009) ...................................................30, 38

*In re Aqua Dots Prod. Liab. Litig.,*
　654 F.3d 748 (7th Cir. 2011) ........................................................16

*In re Baby Products Antitrust Litig.,*
　708 F.3d 163 (3d Cir. 2013) ............................................23, 26, 30

*Bew v. City of Chicago,*
　252 F.3d 891 (7th Cir. 2001) ........................................................46

*Bloyed v. General Motors,*
　881 S.W.2d 422 (Tex. App. 1994) .................................................31

*In re Bluetooth Headset Prod. Liab. Litig.,*
　654 F.3d 935 (9th Cir. 2011) ....................8, 10, 18-20, 23-24, 30-31, 33, 43, 46

*Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.,*
　331 U.S. 519 (1947) ......................................................................39

*Brill v. Countrywide Home Loans, Inc.,*
　427 F.3d 446 (7th Cir. 2005) ........................................................42

*Buchet v. ITT Consumer Fin. Corp.,*
　858 F. Supp. 944 (D. Minn. 1994) ................................................28

*Churchill Vill., L.L.C. v. Gen. Elec.,*
　361 F.3d 566 (9th Cir. 2004) ......................................................3-4

*In re Citigroup Sec. Litig.,*
　965 F. Supp. 2d 369 (S.D.N.Y. 2013) ...........................................19

*Cole v. Wodziak,*
    169 F.3d 486 (7th Cir. 1999) ........................................................30

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Litig.,*
    418 F.3d 277 (3d Cir. 2005) ..........................................................31

*Cont'l Can Co., Inc. v. Chicago Truck Drivers, Helpers, & Warehouse Workers Union (Indep.) Pension Fund,*
    916 F.2d 1154 (7th Cir. 1990) ................................................. 41-42

*Crawford v. Equifax Payment Services, Inc.,*
    201 F. 3d 877 (7th Cir. 2000) ...............................................16, 20

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC,*
    662 F.3d 913 (7th Cir. 2011) ........................................................16

*Crowe v. Coleman,*
    113 F.3d 1536 (11th Cir. 1997) ............................................. 44-45

*Dechert v. Cadle Co.,*
    441 F.3d 474 (7th Cir. 2006) ........................................................47

*Dennis v. Kellogg Co.,*
    697 F.3d 858 (9th Cir. 2012) ............................................. 23, 27-28

*Devlin v. Scardeletti,*
    536 U.S. 1 (2002) .............................................................................3

*Dixon v. ATI Ladish LLC,*
    667 F.3d 891 (7th Cir. 2012) ........................................................46

*In re Dry Max Pampers Litig.,*
    724 F.3d 713 (6th Cir. 2013) ...........................9-10, 24, 30, 32-33, 45-46

*Eubank v. Pella Corp.,*
    753 F.3d 718 (7th Cir. 2014) ...............3, 4-5, 13, 15, 17, 20-24, 26-27, 29, 32-33, 47-48

*Exelon Generation Co., LLC v. Local 15, IBEW,*
    676 F.3d 566 (7th Cir. 2012) ........................................................35

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
    545 U.S. 546 (2005) ................................................................ 41-42

*Fidel v. Farley,*
    534 F.3d 508 (6th Cir. 2008) ...................................................................... 3-4

*Fleisher v. Fiber Composites, LLC,*
    No. 12-cv-1326, 2014 U.S. Dist. LEXIS 29151 (E.D. Pa. Mar. 5, 2014) ...................... 28

*Fraternal Order of Police Lodge No. 89 v. Prince George's County,*
    608 F.3d 183 (4th Cir. 2010) ...................................................................... 45

*In re General Am. Life Ins. Co. Sales Practices Litig.,*
    302 F.3d 799 (8th Cir. 2002) ....................................................................... 4

*In re GMC Engine Interchange Litig.,*
    594 F.2d 1106 (7th Cir. 1979) ...................................................................... 20

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995) ........................................................................ 23

*Gwin v. Am. River Transp. Co.,*
    482 F.3d 969 (7th Cir. 2007) ...................................................................... 14

*Harbison v. Bell,*
    556 U.S. 180 (2009) ............................................................................... 40

*Hodges v. Apple, Inc.,*
    No. 3:13-cv-01128, appeal pending No. 14-15106 (9th Cir.) .............................. 9, 46

*In re HP Inkjet Printer Litig.,*
    716 F.3d 1173 (9th Cir. 2013) .......................................................... 5, 14, 34-40, 43

*In re HP Laser Printer Litig.,*
    2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ........................................... 42-43

*In re Integra Realty Res., Inc.,*
    354 F.3d 1246 (10th Cir. 2004) ................................................................. 3-4

*Kirchoff v. Flynn,*
    786 F.2d 320 (7th Cir. 1986) .................................................................. 38-39

*Lawinger v. C.I.R.,*
    103 T.C. 428 (T.C. 1994) .......................................................................... 36

*London v. Wal-Mart Stores, Inc.*,
    340 F.3d 1246 (11th Cir. 2003) ............................................................. 47-48

*Maciel v. General Motors, LLC*,
    No. 4:14-cv-01339-JSW (N.D. Cal.) ............................................................47

*Manning v. United States*,
    546 F.3d 430 (7th Cir. 2008) ............................................................. 14-15

*Martinez v. Bally's Louisiana, Inc.*,
    244 F.3d 474 (5th Cir. 2001) .................................................................45

*Marx v. Gen. Revenue Corp.*,
    133 S. Ct. 1166 (2013) ..........................................................................39

*Maynard v. Nygren*,
    332 F.3d 462 (7th Cir. 2003) ...........................................................14, 16

*Mayer v. Spanel Int'l Ltd.*,
    51 F.3d 670 (7th Cir. 1995). ..................................................................36

*McCaskill v. SCI Management Corp.*,
    298 F.3d 677 (7th Cir. 2002) ............................................................ 44-45

*In re Mex. Money Transfer Litig.*,
    267 F.3d 743 (7th Cir. 2001) .................................................................28

*Meyer v. Berkshire Life Ins. Co.*,
    372 F.3d 261 (4th Cir. 2004) .................................................................45

*Mirfasihi v. Fleet Mortgage Corp.*,
    356 F.3d 781 (7th Cir. 2004) ...........................................................12, 16

*Mirfasihi v. Fleet Mortgage Corp.*,
    551 F.3d 682 (7th Cir. 2008) .................................................................20

*Moose Lodge No. 107 v. Irvis*,
    407 U.S. 163 (1972) ..............................................................................45

*Murray v. GMAC Mortg.*,
    434 F.3d 948 (7th Cir. 2006) .................................................................26

*Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*,
   582 F.3d 30 (1st Cir. 2009) ............................................................................ 3-4

*National Association of Greeting Card Publishers v. United States Postal Service*,
   462 U.S. 810 (1983) ........................................................................................36

*Opoka v. INS*,
   94 F.3d 392 (7th Cir. 1996) ............................................................................47

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
   469 U.S. 189 (1985) ........................................................................................34

*Reynolds v. Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ..........................................................................32

*In re Rite Aid Corp. Securities Litigation*,
   396 F.3d 294, 299 (3rd Cir. 2005) ............................................................... 3-4

*Robert F. Booth Trust v. Crowley*,
   687 F.3d 314 (7th Cir. 2012) ..........................................................................16

*Robinson v. McNeil Consumer Healthcare*,
   615 F.3d 861 (7th Cir. 2010) ..........................................................................45

*Scherr v. Marriott Int'l, Inc.*,
   703 F.3d 1069 (7th Cir. 2013) ........................................................................39

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
   131 S. Ct. 1885 (2011) ....................................................................................34

*Silverman v. Motorola, Inc.*,
   739 F.3d 956 (7th Cir. 2013) .......................................................................3, 20

*Stanford v. C.I.R.*,
   152 F.3d 450 (5th Cir. 1998) ..........................................................................36

*Synfuel Techs. v. DHL Express (USA)*,
   463 F.3d 646 (7th Cir. 2006) ................................................... 14, 28, 30-31, 38

*In re Synthroid Mktg. Litig.*,
   264 F.3d 712 (7th Cir. 2001) ..........................................................................30

*Taubenfeld v. AON Corp.,*
    415 F.3d 597 (7th Cir. 2005) ........................................................................46

*Thorogood v. Sears, Roebuck & Co.,*
    627 F.3d 289 (7th Cir. 2010) (denying rehearing *en banc*),
    *underlying opinion vacated on other grounds,*
    131 S.Ct. 3060 (2011) ..............................................................................12, 15

*True v. Am. Honda Motor Co.,*
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) ........................................................28

*Turley v. Gaetz,*
    625 F.3d 1005 (7th Cir. 2010) ......................................................................33

*United States v. Lowe,*
    632 F.3d 996 (7th Cir. 2011) ...................................................................14, 16

*Vollmer v. Selden,*
    350 F.3d 656 (7th Cir. 2003) ........................................................................20

*Vought v. Bank of Am.,*
    No. 10-cv-2052, 2012 U.S. Dist. LEXIS 143595 (C.D. Ill. Oct. 4, 2012)......................46

*Weinberger v. Great N. Nekoosa Corp.,*
    925 F. 2d 518 (1st Cir. 1991).........................................................................18

*W. Virginia Univ. Hospitals, Inc. v. Casey,*
    499 U.S. 83 (1991)....................................................................................40-41

*In re Wireless Telephone Federal Cost Recovery Fees Litigation,*
    396 F.3d 922 (8th Cir. 2005) ..........................................................................4

Rules and Statutes

15 U.S.C. § 77z-1(a)(6)....................................................................................27

15 U.S.C. § 78u-4(a)(6) ...................................................................................27

28 U.S.C. § 1291 .............................................................................................2

28 U.S.C. § 1332(d)(2).....................................................................................1

28 U.S.C. § 1711 note § 2(a)(3)(A) ..................................................................12, 38, 40

28 U.S.C. § 1712 .............................................................. 10, 14, 20, 33-41, 45

28 U.S.C. § 1712(a) ..........................................................5, 7-9, 12, 14, 33-43

28 U.S.C. § 1712(b) ......................................................................... 39-40, 42

28 U.S.C. § 1712(c) ...............................................................................39, 43

42 U.S.C. § 1983 ...................................................................................29-30

42 U.S.C. § 1988 ...................................................................................30, 38

Fed. R. App. Proc. 4 ...................................................................................2

Fed. R. App. Proc. 4(a)(1)(A) ...................................................................... 2-3

Fed. R. App. Proc. 4(a)(3) ..........................................................................3

Fed. R. App. Proc. 4(a)(4)(A)(iv) ................................................................. 2-3

Fed. R. App. Proc. 4(a)(4)(B)(i) ..................................................................2

Fed. R. Civ. Proc. 23 ...............................................................................12

Fed. R. Civ. Proc. 23(a)(4) ........................................................... 5, 14, 29, 33, 46-47

Fed. R. Civ. Proc. 23(b)(3) .........................................................................3

Fed. R. Civ. Proc. 23(e) ............................................................7, 15, 19, 21, 24, 29-30

Fed. R. Civ. Proc. 23(e)(2) ........................................................................30

Fed. R. Civ. Proc. 23(g)(4) ........................................................................29

Fed. R. Civ. Proc. 23(h) ...........................................................13, 19, 22, 24, 29

Fed. R. Civ. Proc. 58 ...................................................................................2

Fed. R. Civ. Proc. 59 .........................................................................2-4, 11

<u>Other Authorities</u>

Advisory Committee Notes on 2003 Amendments to Rule 23 ...........................................27

Akerlof, George A.,
    *The Market for Lemons: Quality Uncertainty and the Market Mechanism,*
    84 Q. J. ECON. 488 (1970) ..............................................................................26

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05, *comment a* (2010) ...................30

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.13 (2010)........................................27

BAIRD, DOUGLAS G., *et al.,*
    GAME THEORY AND THE LAW (1998)..............................................................................26

BLACK'S LAW DICTIONARY (9th ed. 2009) ............................................................................40

Ebay.com,
    *Southwest Drink Coupons*, http://is.gd/ebay_southwest
    (redirect to Ebay website) (last accessed Aug. 15, 2014)......................................28-29

Federal Judicial Center,
    *Manual for Complex Litigation (Fourth)* § 21.71 (2004)...................................27

Fisher, Daniel,
    *Odds Of A Payoff In Consumer Class Action? Less Than A Straight Flush,*
    Forbes.com (May 8, 2014)......................................................................................26

Grow, Brian,
    *The Great Rebate Runaround*, BUSINESS WEEK, Nov. 22, 2005......................................27

Leslie, Christopher R.,
    *A Market-Based Approach to Coupon Settlements in Antitrust and Consumer*
    *Class Action Litigation*, 49 UCLA L. REV. 991 (2002) ........................................28

SEN. REP. NO. 109-14 (2005),
    reprinted in 2005 USCCAN 3 .............................................................................37, 42

Silver, Charles, *Due Process and the Lodestar Method,*
    74 Tulane L. Rev. 1809 (2000) ...........................................................................19, 39

Tharin, James & Brian Blockovich,
  *Coupons and the Class Action Fairness Act,*
  18 GEO. J. LEGAL ETHICS 1443 (2005)...........................................................................28

Wald, Patricia M.,
  *Some Observations on the Use of Legislative History in the 1981 Supreme Court
  Term,*
  68 IOWA L. REV. 195 (1983)...........................................................................42

Wolfman, Brian, and Alan B. Morrison,
  *Representing the Unrepresented in Class Actions Seeking Monetary Relief,*
  71 NYU L. Rev. 439 (1996)................................................................... 31-32

Yaffe, Gideon,
  LIBERTY WORTH THE NAME: LOCKE ON FREE AGENCY (2000) ................................ 36-37

**Statutes and Rules**

**28 U.S.C. § 1711 note.**

…

§ 2(a) Findings. Congress finds the following: …

(3) Class members often receive little or no benefit from class actions, and are sometimes harmed, such as where—

(A) counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value;

…

**28 U.S.C. § 1712.**

**(a)     Contingent fees in coupon settlements.–** If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

**(b)     Other attorney's fee awards in coupon settlements.–**

**(1)     In general.–** If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.

**(2)     Court approval.–** Any attorney's fee under this subsection shall be subject to approval by the court and shall include an appropriate attorney's fee, if any, for obtaining equitable relief, including an injunction, if applicable. Nothing in this subsection shall be construed to prohibit application of a lodestar with a multiplier method of determining attorney's fees.

**(c)      Attorney's fee awards calculated on a mixed basis in coupon settlements**.– If a proposed settlement in a class action provides for an award of coupons to class members and also provides equitable relief, including injunctive relief–

> **(1)**      that portion of the attorney's fee to be paid to class counsel that is based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (a); and

> **(2)**      that portion of the attorney's fee to be paid to class counsel that is not based upon a portion of the recovery of coupons shall be calculated in accordance with subsection (b).
>
> …

**Federal Rule of Civil Procedure 23. Class Actions.**

**(a)      Prerequisites.**

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> …
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

…

**(e)      Settlement, Voluntary Dismissal, or Compromise.**

The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

> …
>
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

…

**(g)**     **Class Counsel.**

…

(4) *Duty of Class Counsel*. Class counsel must fairly and adequately represent the interests of the class.


**(h)**     **Attorney's Fees and Nontaxable Costs.**

In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties agreement. The following procedures apply:

 (1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, direct to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

…

**Jurisdictional Statement**

The district court has jurisdiction under 28 U.S.C. § 1332(d)(2) because the plaintiffs' class-action complaint alleges claims that exceed $5,000,000 exclusive of interests and costs, the number of members of the class exceeds 100, and there are numerous class members who are citizens of states other than defendant's state of citizenship. For example, named plaintiff Adam J. Levitt is a citizen of the State of Illinois, while Defendant Southwest Airlines Company is a publicly-traded corporation organized under the laws of the State of Texas with its principal place of business in the State of Texas and, therefore, is a citizen of Texas. R138.[1]

The district court issued a Memorandum Opinion and Order Granting Final Approval and Incentive Awards on August 26, 2013, A1 ("Final Approval Order"); a Memorandum Opinion and Order Granting Plaintiffs' Petition for Attorneys' Fees in Part on October 3, 2013, A23 ("Fee Order"); the Final Judgment on October 10, 2013, A50 ("Final Judgment"); and the Memorandum Opinion and Order granting plaintiffs' motion to amend the Fee Order on June 20, 2014, A60 ("Reconsideration Order").

---

[1] "Axyz" refers to page xyz of appellants' Appendix. "Dkt." refers to docket entries in No. 11-cv-08176 (N.D. Ill.) below. "Rxyz" refers to the PageID of the record as marked for No. 14-2602. Though the settlement, Dkt. Nos. 88 and 90, were included in the Record for No. 13-3462, they were not included in the Record for 14-2602; Markow (and apparently the other parties) did not realize that earlier requests to augment the Record on Appeal were not carried forward to successive and amended appeals. We have included these docket entries in the appendix.

This Court has jurisdiction under 28 U.S.C. § 1291 as these are appeals from final orders.

Markow timely submitted his initial Notice of Appeal (No. 13-3109) from the Final Approval Order on September 24, 2013. R1554. That Notice of Appeal was submitted twenty-nine days after the district court issued its Final Approval Order and closed the case, but before the district court issued its Fee Order and Final Judgment. Thus Markow filed the September 24 Notice of Appeal out of an abundance of caution because the district court had closed the case and because, under Fed. R. App. P. 4, there is no penalty for filing a notice of appeal early but there is a penalty for filing a notice of appeal late..

On October 11, 2013, one day after the lower court's Fed. R. Civ. P. 58 Final Judgment was docketed, Markow timely filed his Amended Notice of Appeal, R1668, encompassing both of the above Orders and the Final Judgment. The appeal was timely under Fed. R. App. P. 4(a)(1)(A), and again under Fed. R. App. P. 4(a)(4)(A)(iv) because plaintiffs later filed a timely Rule 59 motion on November 7, 2013. R1870. At that time, Markow's 13-3109 appeal had not yet "become[] effective." Fed. R. App. P. 4(a)(4)(B)(i). On November 27, 2013, with the Clerk's office having opened No. 13-3264 in response to the Amended Notice of Appeal instead of associating the Amended Notice with 13-3109, a three-judge panel of this Court dismissed Appeal No. 13-3109 as "unnecessary" and instructed that "[a]ppellant's appeal will proceed under Appeal No. 13-3264." No. 13-3109, Dkt. 30 at 2.

On November 4, 2013, objecting class member Alison Paul filed a notice of appeal timely under Rule 4(a)(1)(A). R1780.

On June 20, 2014, the lower court granted in part plaintiffs' Rule 59 motion. A60.

On July 7, 2014, plaintiffs had filed a notice of appeal from the district court's orders approving final settlement, entering final judgment, approving in part plaintiffs' motion for attorneys' fees, and approving in part plaintiffs' motion for reconsideration, thus effecting a cross-appeal. R3026. This appeal is timely under Fed. R. App. P. 4(a)(1)(A) and 4(a)(4)(A)(iv).

Markow timely filed a second amended notice of appeal on July 18, 2014 to encompass this post-judgment order. A212. On that day, Alison Paul also filed an amended notice of appeal to that same effect. A214. These appeals are timely under Fed. R. App. P. 4(a)(1)(A), 4(a)(3), and 4(a)(4)(A)(iv).

Markow and Paul, as class members and objectors to settlement approval below, have standing to appeal a final approval of a class action settlement without the need to intervene formally in the case. *Devlin v. Scardelletti*, 536 U.S. 1 (2002). Southwest has asserted in earlier filings to this Court that *Devlin* does not apply to a Rule 23(b)(3) class action. This is wrong. This Court has repeatedly implicitly assumed without discussion that *Devlin* applies to Rule 23(b)(3) class actions, even when appellees have challenged objector standing for other reasons. *Eubank v. Pella Corp.*, 753 F.3d 718, 729 (7th Cir. 2014) (citing *Devlin* and holding challenge to standing frivolous); *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 957 (7th Cir. 2013) (dismissing one objector's appeal for lack of standing while considering appeal of non-intervening objector). ***Every*** court of appeals to explicitly consider and rule on the question has rejected Southwest's proposed limitation on *Devlin*. "*Devlin*, after all, is about party status and one who could cease to be a party is still a party until opting out." *Nat'l Ass'n of Chain Drug Stores*

*v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 39-40 (1st Cir. 2009). *Accord In re Rite Aid Corp. Securities Litigation,* 396 F.3d 294, 299 (3rd Cir. 2005); *Fidel v. Farley,* 534 F.3d 508, 512-13 (6th Cir. 2008); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 572-73 (9th Cir. 2004); *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1257 (10th Cir. 2004).[2]

In an abundance of caution, on November 14, 2013, before the district court ruled on the Rule 59 motion, Markow moved for intervention for the limited purpose of appealing the orders granting final approval and awarding fees. R2320. Markow's motion for intervention was granted on December 6, 2013 "pursuant to the documents he previously, and timely, filed." A211. Markow contends that neither appellant needs to intervene.

### Statement of the Issues

1.     *Eubank v. Pella Corp.* suggested that when a "questionable" fee provision with a clear-sailing clause provides for reversion to the defendant, it is error for a court to "refuse to delete" that provision and require reductions to be "added to the compensation of class members." 753 F.3d 718, 723 (7th Cir. 2014). Did the district err as a matter of law or abuse its discretion when it approved a settlement with a clear-sailing clause where $1.33 million in the segregated fee fund reverted to Southwest instead of the class?

---

[2] The Eighth Circuit has refrained from ruling on the issue. *In re Wireless Telephone Federal Cost Recovery Fees Litigation*, 396 F.3d 922, 930 (8th Cir. 2005) (refusing to issue advisory opinion); *In re General Am. Life Ins. Co. Sales Practices Litig.*, 302 F.3d 799, 800 (8th Cir. 2002) (not reaching question because appeal was moot).

2.      *Eubank* held that it is reversible error for a district court to grant final approval to a settlement that is "one-sided" in benefiting class counsel compared to the actual recovery of the class. Did the district court err as a matter of law to approve a settlement with a $3 million clear-sailing fee without even an accounting of the number of coupons claimed, let alone those redeemed, to determine whether the attorneys' proposed Rule 23(h) award was disproportionate?

3.      28 U.S.C. § 1712(a), requires that "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." The Ninth Circuit holds that this language precludes the use of lodestar methodology when attorneys seek fees only for coupon recovery. *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1182 (9th Cir. 2013) ("*Inkjet*"). Did the district court err as a matter of law in approving a settlement and attorney fee that did not comply with 28 U.S.C. § 1712(a)?

4.      As a matter of law, does a class representative have a conflict of interest *per se* precluding Rule 23(a)(4) adequacy if he simultaneously serves as co-counsel with class counsel in a different pending class action undisclosed to the class or the district court? If so, may appellants raise this pure issue of law for the first time on appeal if the appellate court can take judicial notice of the federal proceedings disclosing that relationship?

**Statement of the Case**

**A.     Plaintiffs sue.**

Passengers who purchased premium-priced Business Select tickets from Southwest received coupons for a free drink aboard a flight; in 2011, Southwest stopped honoring these drink coupons. R2. In 2011, two plaintiffs filed a class complaint alleging Southwest had breached its contractual obligations, was unjustly enriched, and had violated state consumer fraud laws. R7-10. Plaintiffs maintained that the drink coupons had no expiration date at the time of issuance, and thus should have been honored indefinitely. R1-2. They sought money damages in the form of compensatory damages, punitive damages, actual damages, treble damages, statutory damages, disgorgement, restitution, and interest. R10; R146-48. After the court granted Southwest's motion to dismiss three of the four claims, only the breach of contract claim remained. R338.

The complaint referred to the coupons as coupons. R1-9.

**B.     The parties settle.**

The parties initially settled on October 31, 2012, and filed the operative settlement on December 7, 2012. R467; A96. The settlement provides no monetary relief to class members. It allows them to claim a coupon (called a "voucher" in the settlement) for a beverage on a Southwest Airlines flight by submitting a form along with supporting documentation. A113-15. Class members' deadline to make claims was September 2, 2013, months after the April fairness hearing. A97. These coupons expire after one year, and can only be redeemed aboard a Southwest flight. A101; R1014. The two named representatives could submit unopposed applications for $15,000 incentive

awards each. A107. Initially, the parties agreed upon a range of attorneys' fees between $1.75 million and $7 million. A119. However, they subsequently agreed for class counsel to seek $3 million in unopposed "clear-sailing" fees. A125. This amount was segregated from class relief, so that any reduction from that request would benefit only the defendant, not the class. *Id*. Additionally, the settlement requires Southwest to comply with the law prospectively, by honoring the expiration dates printed on future coupons, honoring future coupons without expiration dates (if Southwest distributes any) at any time, and printing expiration restrictions conspicuously on the coupons. A106-07. The settlement was preliminarily approved. R661. Along with publication notice, direct notice was sent to 2,492,625 class members. R1010.

## C.    Markow and Paul object.

Gregory Markow and Alison Paul, members of the class, objected to the settlement and the fee request. A128-54. (Markow timely filed a claim after his objection. A198.) Markow objected that the settlement as structured would lead to disproportionate relief to the attorneys, and that as, as proposed, it did not comply with the Class Action Fairness Act ("CAFA"). A137-45. Because plaintiffs expressly calculated the value of the settlement and their fee request based on the value of the coupons, without ascribing value or entitlement to fees based on the prospective injunctive relief, Markow argued, 28 U.S.C. § 1712(a) applied. A144 (citing R710). Paul joined Markow's objections.

Markow specifically objected that the settlement violated Fed. R. Civ. P. 23(e) because it was structured to benefit counsel and named plaintiffs at the expense of

absent class members. A140-42, A144-45. Specifically, Markow explained that the disproportionate allocation between Plaintiffs' fees and class relief rendered the settlement unfair, A137; and argued that the presence of all three red flags from *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 934, 947-49 (9th Cir. 2011), made the settlement unfair:

> The other two *Bluetooth* red flags for unfairness are also present: a clear-sailing agreement and reversion to the defendant of unawarded attorneys' fees. The combination of all three demonstrates the settlement's unfairness: class counsel has negotiated $3 million in cash for itself, segregated from class recovery. It has negotiated protection from scrutiny on the fee award from Southwest. And if the fee award is reduced, the excess is returned to Southwest, rather than the class—even though Southwest was willing to pay the full $3 million to resolve the litigation. The only reason to have a reversion to Southwest instead of the class is to attempt to protect an excessive fee award from scrutiny, and deter challenges to the fee award. The $3 million should be considered part of a constructive common fund, and the fact that it is shielded from the class is inherently unfair.

A140 (citations omitted); *see also* A140-42 (arguing settlement's actual value must be proportionate to attorney recovery).

Markow further argued that the court must consider the number of coupons claimed in evaluating the settlement, even though the claims deadline was September 2, well after the fairness hearing date. A142-43.

Markow reiterated his argument that 28 U.S.C. § 1712(a) governed this case in other filings. R869; R1348. Plaintiffs disputed that CAFA applied at all; Southwest conceded CAFA applied, but argued § 1712(a) did not. R1302-03.

D.     **Fairness hearing.**

Markow appeared through counsel at the May 23, 2013 fairness hearing. A159-69. Markow's argument focused on the applicability of CAFA and § 1712(a), but counsel specifically stated that Markow relies "on the papers" for argument regarding his other objections. A169.

The district court, telling Markow's counsel to summarize in "30 seconds," asked Markow whether he has a view on "the whole thing about giving them a coupon," to which Markow replied, "No, not to that." A169. When the court stated that, "You don't have a problem with that. You object to the incentive awards and you object to the fees," Markow replied, "Yes." *Id.*

While the settlement-approval motion was under submission, Markow filed a Notice of Pertinent Authority with the district court, drawing its attention to the post-fairness-hearing decision *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013). A196. Markow reiterated his argument that settlement fairness requires proportionality between class recovery and attorney recovery, and argued *Pampers* supported those arguments against settlement and fee approval. A196-97.

No one below inquired into the relationship between lead plaintiff Adam J. Levitt and class counsel Joseph Siprut, but at the time of the fairness hearing, the two were co-counsel in a class action in the Northern District of California where the complaint was filed March 13, 2013, with both designated "lead attorney" status for the sole named plaintiff. *Hodges v. Apple, Inc.*, No. 3:13-cv-01128, appeal pending No. 14-15106 (9th Cir.). This relationship was neither disclosed in the class notice nor in any filings in the district court.

**E.    The district court approves the settlement and reduces the fee award.**

The court issued its Final Approval Order before the claims deadline passed, approving the settlement and the incentive awards on August 26, 2013. A1. The opinion expressly rejected Markow's contention that the named representatives' oversized incentive awards rendered their representation inadequate A10-11, but did not specifically address Markow's objection regarding the combination of provisions that slanted the settlement inequitably in favor of class counsel. It did not mention *Bluetooth*, and distinguished *Pampers* on the grounds that the relief in that settlement was entirely "illusory." A11.

In an abundance of caution, Markow filed a premature notice of appeal on September 24, 2013, R1554, which initiated the since-dismissed companion Appeal No. 13-3109.

On October 3, 2013, the court issued its Fee Order. It held that though the settlement's coupons were "coupons" for purposes of the Class Action Fairness Act, it had the discretion to employ the lodestar method of calculating fees under 28 U.S.C. § 1712. A28-38. Conducting the lodestar analysis, the court eschewed the $3 million proposed by class counsel, which would have required a 2.63 multiplier. A46. Instead, it determined the appropriate lodestar figure was $888,137.50 and an appropriate multiplier was 1.5, for a total award of $1,332,206.25. A47-48. Although the court recognized that "it is unlikely that a particular high percentage of the vouchers actually will be used, or even claimed," it did not require the parties to submit the available claim rates onto the record, and used that finding solely for analysis of the fee award. A46. The court entered final judgment a week later. A50.

Markow timely filed his amended notice of appeal the next day, adding the Fee Order and Final Judgment to his earlier appeal of the Final Approval Order. R1668. Paul timely filed her first notice of appeal on November 4, 2013. R1780.

Plaintiffs moved for Rule 59 reconsideration of the fee order on November 7, 2013. R1870.

At the appellate level, Southwest contended that Markow did not have appellate standing because he was not an intervenor. No. 13-3109 Dkt. 26. Markow disputed this argument, but, as the case was reopened, filed a motion to intervene for the limited purpose of preserving his appellate rights. Southwest opposed, necessitating two hearings, on the grounds that the district court should limit Markow's right to appeal to only cover the fee request. The district court granted Markow's motion to intervene, "pursuant to the documents he previously, and timely, filed," but rejected Markow's argument that Southwest's position was frivolous. A210.

On June 20, 2014, the district court granted in part plaintiffs' Rule 59 motion. A60. It reevaluated its finding on lodestar, while keeping the multiplier at 1.5, resulting in a plaintiffs' fee award to $1,649,118 with expenses in the amount of $18,522.32. A75, *id.* at 16. Plaintiffs cross-appealed this award. R3026. Markow and Paul timely filed amended notices of appeal. A212, A214.

This Court consolidated the four extant appeals by the two appellants and the cross-appeal under No. 13-3264.

## Summary of the Argument

This Court has long recognized the inherent conflict of interest between class counsel and the class: "the structure of class actions under Rule 23 of the federal rules gives class action lawyers an incentive to negotiate settlements that enrich themselves but give scant reward to class members, while at the same time the burden of responding to class plaintiffs' discovery demands gives defendants an incentive to agree to early settlement that may treat the class action lawyers better than the class." *Thorogood v. Sears, Roebuck, & Co.*, 627 F.3d 289, 293-94 (7th Cir. 2010) (citing authorities) (denying rehearing *en banc*), *underlying opinion rev'd on other grounds*, 131 S.Ct. 3060 (2011); *accord Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). Congress, too, has expressed concern about class-action settlements where "counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value." 28 U.S.C. § 1711 note § 2(a)(3)(A). Does Rule 23 permit class counsel to exploit the class-action settlement process so that the attorneys are the primary beneficiary of a settlement at the expense of their clients?

Class counsel negotiated a settlement for themselves where Southwest Airlines agreed not to challenge a fee request of $3 million. What did their allegedly injured clients receive? Coupons for a free drink on a Southwest flight, good for one year.

Class member Gregory Markow objected, arguing that the settlement was structured so that the attorneys would receive more than the class, and that allocation made the settlement unfair. While acknowledging that it was possible for parties to create a coupon settlement, he asked the district court to determine the number of coupons that would be claimed, and to require the parties to follow 28 U.S.C. § 1712(a).

The district court, while acknowledging that the claims and redemption rate would not be 100%, was persuaded not to inquire into what the actual class relief was because the settling parties responded that the number of coupons did not matter to settlement fairness. That can't be right: what if only a single coupon was claimed and used, while the attorneys got $3 million? In *Eubank v. Pella Corp.*, a ratio of $11 million for the attorneys to $8.5 million to the class (or 56% to the attorneys) was so "one-sided[]" to "flunk[] the 'fairness' standard." 753 F.3d 718, 727, 729 (7th Cir. 2014). The district court committed reversible error in failing to make the required inquiry into the actual recovery of the class. And this Court can go further by using the sort of "generous assumption[s]" it did in *Eubank* (*id.* at 726) to determine that there is no way that the class will receive $3 million of benefit from this settlement that the attorneys negotiated for themselves, and reject the settlement entirely: it is virtually certain that the actual value of class recovery will be nowhere near class counsel's proposed $3 million recovery.

The district court responded to Markow's objection by reducing the multiplier on class counsel's lodestar in their Rule 23(h) request, meaning that class counsel received $1.67 million instead of $3 million. But this just highlighted another settlement unfairness. As in *Eubank*,

> another questionable provision of the settlement, which the judge refused to delete, made any reduction in the [$3 million] attorneys' fee award revert to [Southwest], rather than being added to the compensation of the class members.

*Id.* at 723. This clause and the resulting $1.33 million reversion to Southwest makes the settlement *per se* unfair. Southwest was willing to put $3 million of cash on the table to

settle the case. Instead of ensuring that a proportional amount of the settlement benefit was allocated to the class, class counsel chose to instead segregate that money in a separate fund and negotiate a provision precluding Southwest from challenging the fee request.

The fee clauses of the agreement ran afoul of CAFA's requirements for coupon settlements. 28 U.S.C. § 1712(a); *Inkjet*, 716 F.3d 1173. A settlement and fee request that does not comply with CAFA cannot be approved, and the district court's failure to hold the parties to § 1712 was independent reversible error. To top it all off, the class representative had an untenable conflict of interest that precluded Rule 23(a)(4) adequacy but was neither disclosed to the class nor the court.

## Standard of Review

Approval of class settlements is reviewed for abuse of discretion. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006). "Abuse of discretion occurs when the district court commits a serious error of judgment, such as the failure to consider an essential factor." *United States v. Lowe*, 632 F.3d 996, 997 (7th Cir. 2011). And "[a] district court by definition abuses its discretion when it makes an error of law." *Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003) (internal citation omitted).

Questions regarding the legal principles undergirding review of class settlement approval motions are questions of law about the proper interpretation of Rule 23(e) and Rule 23(a)(4). They are reviewed *de novo*. *See Gwin v. Am. River Transp. Co.*, 482 F.3d 969, 974 (7th Cir. 2007). The proper interpretation of 28 U.S.C. § 1712, as a matter of statutory

interpretation, is a question of law reviewed *de novo*. *See, e.g., Manning v. United States*, 546 F.3d 430, 432 (7th Cir. 2008).

## Argument

**I.     Settlement approval cannot stand because this is a "one-sided" settlement that benefits class counsel at the expense of the class: the unopposed and segregated fee and incentive awards and the likely disproportion between class recovery and attorney recovery render it unfair.**

This settlement was unfairly stacked against the class: class counsel negotiated a settlement where it received $3 million in cash (segregated from class recovery and free from scrutiny from Southwest) that would be returned to Southwest (not to the class) if class counsel were awarded a reduced fee. While the number of $5 drink vouchers the class *actually* redeemed is unknown, it is likely significantly less and disproportionate to the $3 million Southwest was willing to pay to class counsel. These danger signs—fees disproportionate to *actual* class relief, segregated and unopposed fee award, and reversion to the defendant of fees not awarded—were among the ones that caused this Court to reverse the settlement approval in *Eubank v. Pella Corp.*, 753 F.3d 718, 728-29 (7th Cir. 2014).

*Eubank*'s "settlement flunked the 'fairness' standard by the one-sidedness of its terms." *Id.* at 729. This is because a consumer class-action settlement designed to make class counsel the primary beneficiary—and where class counsel is the primary beneficiary—is unfair under Rule 23(e) and demonstrates a lack of adequacy under Rule 23(a)(4). *See Eubank*, 753 F.3d at 724, 728-29; *cf. Thorogood*, 627 F.3d at 293-94

(warning of risk of settlements treating class counsel better than the class); *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011) (counsel must show the district court that "they would prosecute the case in the interest of the class … rather than just in their interests as lawyers who if successful will obtain a share of any judgment or settlement as compensation for their efforts."); *cf. also Robert F. Booth Trust*, 687 F.3d at 319 (preempting settlement hearing and dismissing case because "only goal of this suit appears to be fees for the plaintiffs' lawyers"); *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) (class cannot be certified when only beneficiary of the case will be the attorneys); *Crawford v. Equifax Payment Servs., Inc.*, 201 F. 3d 877, 882 (7th Cir. 2000) (rejecting settlement providing only injunctive relief and *cy pres*).

"Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi*, 356 F.3d at 785 (7th Cir. 2004). The concerns are yet heightened "when the class members are consumers, who ordinarily lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf." *Creative Montessori,* 662 F.3d at 917.

Here, the district court failed to consider these "danger signs" and "questionable" aspects of the settlement structure. A district court's "failure to consider an essential factor" such as these when deciding upon a settlement's fairness is an error of law and an abuse of discretion. *Lowe*, 632 F.3d at 997; *Maynard*, 332 F.3d at 467.

Indeed, the failure to consider these factors was not just a technical omission, but, had they been properly considered, would have required settlement rejection.

The district court further erred in failing to consider whether the settlement proposal disproportionately favored class counsel relative to their putative clients. While the court correctly rejected the parties' proposed settlement valuation of $29 million, it failed to consider the fairness implications of a settlement that almost certainly paid the class less than class counsel proposed to pay itself. *Eubank* held it reversible error to adopt a hypothetical valuation of the settlement without considering the actual claims rate, 753 F.3d at 723; here, the district court's analysis failed, over Markow's objection, to even demand *any* evidence of the actual claims rate, and the parties successfully hid the ball from the public. At a minimum, this is reversible error requiring remand.

### A.     Reversion of unawarded fees to Southwest Airlines exacerbates the unfairness caused by the clear-sailing agreement.

As in *Eubank*,

> another questionable provision of the settlement, which the judge refused to delete, made any reduction in the [$3 million] attorneys' fee award revert to [Southwest], rather than being added to the compensation of the class members.

753 F.3d at 723. This actually prejudiced the class and made the settlement *per se* unfair. Southwest was willing to put $3 million of cash on the table to settle the case. Instead of ensuring that a proportional amount of the settlement benefit was allocated to the class, class counsel chose to instead segregate that money in a separate fund and negotiate a

"clear sailing" provision precluding Southwest from challenging the fee request. This breach of fiduciary duty to the class cannot be tolerated.

A clear sailing clause stipulates that attorney awards will not be contested by opposing parties. "Such a clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). The clear sailing clause lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Id*. at 524; *accord Bluetooth*, 654 F.3d at 947. Here, plaintiffs and Southwest had agreed that Southwest would not oppose an award of plaintiffs' fees up to $3 million. A3-4. The court acknowledged this fact in its description of the parties' mediation process and in awarding fees. *Id*; A25. But the court did not consider this *Bluetooth* factor at all in its analysis of the settlement's merits.

The problem is compounded because in this settlement, unawarded attorneys' fees do not redound to the class, but rather revert to Southwest. Such reversion is also known as a "kicker." A "kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Bluetooth*, 654 F.3d at 949. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id*. The kicker, like the disproportionate allocation and like the clear-sailing agreement, is a sign "that class counsel have allowed pursuit of their own self-interests … to infect the negotiations." *Id*. at 947.

The problem is that, normally, when attorneys demand disproportionate fees from a single common fund, a district court can correct any settlement unfairness problem by denying the Rule 23(h) request in part, and reallocating the excess to the class. *E.g., In re Citigroup Sec. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) (reducing excessive fee request by $26.7M for benefit of shareholders). But such a settlement cure to a disproportionate oversized fee request is impossible when clear-sailing fees are effectively placed in a segregated fund away from the class's reach—unless, as *Eubank* suggests, the court requires the parties to "delete" the "questionable" provision. "If the defendant is willing to pay a certain sum in attorneys' fees as part of the settlement package, but the full fee award would be unreasonable, there is ***no apparent reason*** the class should not benefit from the excess allotted for fees." *Bluetooth*, 654 F.3d at 949 (emphasis added).

In his objection, Markow warned of the unfairness of this reversion mechanism. A140. The actual reversion of an oversized fee request to the defendant bespeaks an inherently unfair settlement under Rule 23(e). Here, because of the accompanying kicker mechanism, class counsel ended up leaving $1.33 million on the table to be reclaimed by Southwest—the difference between the $3 million limit that Southwest had acquiesced to pay and the $1.67 million that was ultimately awarded—when that money could have gone to the class without opposition from Southwest if the parties hadn't structured a settlement that artificially separated class relief from attorneys' fees.

Such reversions are bad public policy for other reasons. The reversionary fee arrangement is "a strategic effort to insulate a fee award from attack." Charles Silver, *Due Process and the Lodestar Method*, 74 TULANE L. REV. 1809, 1839 (2000). When

segregated funds cause excessive fees to revert to the defendant instead of the class, and there is also a clear sailing award, it will often mean that a judge will see only an *ex parte* presentation of the fee request. (That presentation here entirely omitted mention of § 1712. R710.) Class members lose any incentive to challenge the fees in isolation. A class member who objects to an excessive fee request would have to do so *pro bono*: because any fee reduction would go to the defendant, it would create no benefit for the class, and the class member would not be entitled to attorneys' fees for his success in this Circuit. *Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 688 (7th Cir. 2008). Further, an excessive fee award would be partially shielded from appellate review: an objector would not have standing to challenge the fee request if she does not also challenge the settlement approval, as Markow does here. *Cf. Silverman*, 739 F.3d at 957. Objector participation and appellate review are benefits to the class. *Vollmer v. Selden*, 350 F.3d 656, 660 (7th Cir. 2003); *Crawford*, 201 F.3d at 881. It is thus abusive self-dealing to shield the fees from scrutiny, which is why this Court observes that such reversion mechanisms are a danger sign of unfairness in a settlement. *Eubank*, 753 F.3d at 723; *cf. also In re GMC Engine Interchange Litig.*, 594 F.2d 1106, 1130-31 (7th Cir. 1979).

It was reversible error to fail to require the parties to "delete" the "questionable" provision—especially when it resulted in $1.33 million of class benefit falling into Southwest's pockets. *Eubank*, 753 F.3d at 723. There "is no apparent reason the class should not benefit from the excess allotted for fees." *Bluetooth*, 654 F.3d at 949. The district court identified none (ignoring *Bluetooth* and Markow's objection), and the settling parties will not be able to either.

**B.    The district court erred as a matter of law in failing to determine the actual class benefit; the settlement's proposed $3 million to attorneys is likely disproportionately high relative to the amount the class will enjoy in coupons, and is therefore *per se* unfair.**

> **1.    The district court committed reversible error when it failed to determine the actual value of the class recovery.**

As in *Eubank,*

> "the judge approved [the settlement] before the deadline for filing claims. He made no attempt to estimate how many claims were likely to be filed, though without such an estimate no responsible prediction of the value of the settlement to the members of the class could be made."

753 F.3d at 723. While the district court considered (and rejected) plaintiffs' $29 million valuation for purposes of awarding attorneys' fees, it made no attempt to correctly value the class recovery in analyzing the settlement's fairness. A46.

Instead of looking at the problem of allocation fairness, the district-court's Rule 23(e) inquiry looked solely at adequacy. The district court acknowledged that the coupon relief obtained was worthless to many class members, but found that this was irrelevant to Rule 23(e) because such class members are "no worse off than they were before" when they possessed the original drink vouchers.[3] A9-10, A10 n. 2. But the fact

---

[3] Such class members are, in fact, marginally worse off to the extent the suit is not frivolous. Their outstanding claims are released by this settlement and they have access only to a claims process for vouchers with expiration dates to replace vouchers allegedly unencumbered by such fine print. The premise that "the proposed settlement calls for a full-value, one-to-one reimbursement of drink vouchers for class members" is peppered throughout the district court's decisions, but contradicts the allegations of the complaint. A13; R1-9.

that class members may not be especially damaged does not affect the requirement that the *allocation* of the settlement be fair. Perhaps the lawsuit is frivolous, and a peppercorn of recovery to the class as a whole would be adequate—but Southwest, for whatever reason, was willing to put $3 million of cash on the table to settle the case. Class counsel segregated that entire amount for itself, with reversion to Southwest. If Southwest's attorneys negotiated a bad settlement for Southwest that overpaid relative to the value of claims the district court thought weak, then the class should proportionately benefit from that overpayment, instead of class counsel aggregating the windfall solely to itself.

Below, the settling parties argued that the Rule 23(h) request of $3 million was not disproportionate to class recovery because the settlement was worth $29 million in coupons for the class. R713. The $29 million valuation was based on the aggregate face value of the coupons that could possibly be claimed—assuming both a 100% claims rate and a 100% redemption rate. R1010, 1013-14. This runs afoul of *Eubank*. Actual value matters to the fairness determination: hypothetical maximum redemption value does not. In *Eubank*, an expert report estimated that it would be possible for class members to make $90 million in claims, 753 F.3d at 727, and the district court adopted that finding in computing the settlement value and holding the settlement fair. 753 F.3d at 723. This Court reversed. There were only twelve thousand claims *actually* made on the defendant, and those claims were not likely to collect more than $8.5 million given the limitations on the claims process. *Id.* at 726-27. It is that latter number that led *Eubank* to determine the settlement one-sided relative to the $11 million attorneys' fees. As *Eubank* shows, absent class members can only be protected when class counsel is incentivized

to negotiate for a process that maximizes payment to the class, and that requires investigation of the actual class recovery.

As in *Eubank*, the claims deadline was months after the fairness hearing. A97. The actual value to the class—the number of coupons *actually* redeemed by the class—was unknown, and could not have even been estimated by the actual number of claims. A97. Scheduling the claims deadline after the fairness hearing is another warning sign of an unfair settlement because it permits class counsel to insulate an excessive fee request from a comparison with the actual number of claims. *Cf. Dennis v. Kellogg Co.*, 697 F.3d 858, 869 (9th Cir. 2012) (rejecting similar "Just trust us. Uphold the settlement now, and we'll tell you what it is later" argument).

Here, the district court properly rejected the plaintiffs' $29 million valuation as unbelievable, finding that "the actual value of what counsel obtained for the class, however, is unquestionably far less than the aggregate face value of the replacement vouchers." A45. But the district court's failure to determine actual recovery and proportionality was reversible error. *Eubank*, 753 F.3d at 726-27; *Bluetooth*, 654 F.3d at 943, 947; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013) (The discernment of benefit "needs to be, as much as possible, practical and not abstract. If the parties have not on their own initiative supplied the information needed to make the necessary findings, the court should affirmatively seek out such information."); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 822 (3d Cir. 1995) ("the district court on remand needs to make some reasonable assessment of the settlement's value and determine the precise percentage represented by the attorneys' fees."). Instead, the district court used the likelihood of a low claims rate only for the Rule 23(h)

inquiry. A46 (factors causing a low claims rate "did not counsel against approving the settlement, … [b]ut they do affect one's view of the degree of success").

This Court should reaffirm its holding in *Eubank* that settlement valuation is to be based on the amount actually received by the class, and that that recovery must be proportionate to the Rule 23(h) request. Because the district court did not do so when evaluating settlement fairness, and instead treated the Rule 23(e) and Rule 23(h) inquiries separately, it committed reversible error.

### 2. The settlement here was almost certainly disproportionate.

The failure to determine the number of claims made is not a mere technicality. Even if we assume that every single coupon claimed is a coupon redeemed and worth the full $5 face value—both questionable assumptions, as discussed below—class members would have had to claim about 30% of the $29 million of face value of coupons available before the class recovery was proportionate to $3 million allocated to the attorneys. This is so improbable that any sort of reasonable set of assumptions leads to the conclusion that this settlement had the "one-sidedness" condemned by *Eubank*. *See Eubank*, 753 F.3d at 727  (rejecting result where "attorneys' fees equal to 56 percent of the total settlement"); *Id.* at 729 ("The settlement flunked the 'fairness' standard by the one-sidedness of its terms …"); *cf. also In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013) ("[T]his settlement benefits class counsel vastly more than it does the consumers who comprise the class."); *Bluetooth*, 654 F.3d at 947.

### i.     The value of actual class recovery was very likely low.

This settlement provided class members a claims process through which they could claim coupons, each redeemable for one beverage on a Southwest flight within one year of issuance. Plaintiffs claimed that this was worth $29 million to the class, which assumed both a 100% claims rate and a 100% redemption rate of the aggregate face value of the coupons that could possibly be claimed. R1010; R1013-14. The district court correctly acknowledged that "the actual value of what counsel obtained for the class, however, is unquestionably far less than the aggregate face value of the replacement vouchers" and "does not begin to approach the $29,000,000 that plaintiffs propose." A45-46. That is because "it is unlikely that a particularly high percentage of the vouchers actually will be used, or even claimed." *Id.*

The district court listed numerous factors that would result in a low claims rate—the low value of each coupon relative to the trouble of submitting a claim, the necessity of purchasing a plane trip within a year to redeem the coupon, the likelihood that class members who hadn't already used the coupons before Southwest disavowed them probably didn't value them enough to seek them a second time—"all of this suggests that it is unlikely that a particularly high percentage of the vouchers actually will be used, or even claimed." A45-46. Indeed, there is no realistic chance that class members would claim and redeem $29 million in coupons—that preternaturally every eligible class member would file a claim for every coupon he or she could, and then redeem them all on Southwest flights. "For example, over 500 class members have requested between 26-50 Replacement Vouchers, which Southwest intends to honor." R1013-14. Even if we assume a 10% claims rate, that every claimed coupon is redeemed, and that

the redemption value is the full $5 face value, the actual value to the class would be less than the $3 million class counsel was claiming for itself. And as discussed below, and implicitly acknowledged by the district court, each of these three assumptions is exceedingly generous.

*First*, the actual claims rate is likely much lower than 10%. While there is no public information in the record how many claims were made, we can infer by the refusal of the parties to disclose the information below that the number is embarrassingly small. For if the claims rate could have justified settlement fairness, then the parties—instead of insisting that the claims rate remain secret—would have disclosed it in support of the settlement's final approval and fee requests to convince the court of the settlement's real value to class members. *Cf.* DOUGLAS G. BAIRD, *et al.*, GAME THEORY AND THE LAW 89-91 (1998); George A. Akerlof, *The Market for Lemons: Quality Uncertainty and the Market Mechanism,* 84 Q. J. ECON. 488 (1970).

This Court has long recognized that claims rates in small-sums claims-made cases are low. *Eubank*, 753 F.3d at 726; *Murray v. GMAC Mortg.*, 434 F.3d 948, 952 (7th Cir. 2006). When courts demand disclosure of secret claims rates in consumer settlements, the results almost invariably demonstrate class indifference. *E.g., Baby Prods.*, 708 F.3d at 174-75 ($3 million of claims on partial-compensation settlement fund of $35.5 million). Experienced settlement administrators testify that it is substantially more likely than not that the claims rate in a claims-made settlement would be in the single digits. *E.g.,* Daniel Fisher, *Odds Of A Payoff In Consumer Class Action? Less Than A Straight Flush,* Forbes.com (May 8, 2014).

Claims forms and claims-made settlements are a marketing science. Just as marketers can predict how many fewer rebates will be claimed if they require customers to cut out a UPC symbol to claim a rebate (*see, e.g.,* Brian Grow, "The Great Rebate Runaround," *Business Week* (Nov. 22, 2005)), parties can reasonably predict response rates based on the hoops that they require claimants to jump through. So a two-hoop settlement in which class members must first make a claim and then must redeem a coupon should not be treated as the equivalent of a settlement that pays cash directly and seamlessly to every class member. Doing otherwise runs afoul exactly of the problem in *Eubank*: class counsel obtaining an exaggerated share of the settlement proceeds by creating the illusion of relief without actually requiring the defendant to forfeit cash. 753 F.3d at 723-26. *See also* Advisory Committee Notes on 2003 Amendments to Rule 23 ("it may be appropriate to defer some portion of the fee award until *actual payouts* to class members are known" (emphasis added)); *id.* ("fundamental focus is the result *actually achieved* for class members" (emphasis added); *id.* (*citing* 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest *actually paid* to the class" (emphasis added))). *See also* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.13 (2010) ("*ALI Principles*"); Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71 (2004) ("In cases involving a claims procedure … , the court should not base the attorney fee award on the amount of money set aside to satisfy potential claims. Rather, the fee awards should be based only on the benefits *actually delivered*."); *cf. Dennis*, 697 F.3d at 868 (chronicling problem of "fictitious" fund

valuations that "serve[] only the 'self-interests' of the attorneys and the parties, and not the class.").

*Second*, it is very unlikely that the claimants will actually use *all* of the coupons issued. A 100% redemption rate is more than ten times that of typical redemption rates. *See* James Tharin & Brian Blockovich, *Coupons and the Class Action Fairness Act*, 18 GEO. J. LEGAL ETHICS 1443, 1445, 1448 (2005); Christopher R. Leslie, *A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action Litigation*, 49 UCLA L. REV. 991, 1035 (2002); *see also, e.g.*, *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1074 (C.D. Cal. 2010) (citing cases); *Buchet v. ITT Consumer Fin. Corp.*, 858 F. Supp. 944 (D. Minn. 1994); *Fleisher v. Fiber Composites, LLC*, No. 12-cv-1326, 2014 U.S. Dist. LEXIS 29151 (E.D. Pa. Mar. 5, 2014) (only 94 of 150,000 class members deigning to submit claims for low-value in-kind relief). While the claims process and transferability of these coupons likely means that the redemption rate for claims coupons will concededly be higher than average (class members who bother to jump through the first hoop are presumably more likely to jump through the second than in a case where coupons are simply issued to all class members), 100% redemption is implausible because claimants must purchase a plane ticket to use the coupon and the coupon has a one-year expiration date. The fact that there were millions of unredeemed drink coupons of varying ages at the outset of this litigation demonstrates that the coupons regularly go unused.

*Third*, a redeemed coupon cannot be credited its $5 face value. This Court has repeatedly recognized that "[c]ompensation in kind is worth less than cash of the same nominal value." *Synfuel*, 463 F.3d at 654 (quoting *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001). When sold in online auctions, for example, these "$5"

coupons trade for between $2.50 and $3.50 each. Ebay.com, *Southwest Drink Coupons*, http://is.gd/ebay_southwest (redirect to Ebay site) (last accessed Aug. 15, 2014).

The true value of the class recovery in this case is therefore not just less than the $3 million Rule 23(h) request, but likely substantially below it.

> ### ii.     Disproportionate allocation violates Rule 23(e) even without a showing of actual collusion.

If so, this means the settlement was unfair. *Eubank* recently held that "one-sided[]" settlements benefitting primarily class counsel at the expense of the class are unfair as a matter of law. 753 F.3d at 727, 729 (ratio of $8.5 million actual recovery to $11 million in fees). *Eubank* requires reversal because the district court failed to consider the one-sided nature of this settlement in approving it, using the likely small recovery only to reduce the Rule 23(h) request.

Simply put, a consumer class-action settlement designed to make class counsel the primary beneficiary—and where class counsel *is* the primary beneficiary—is *per se* unfair under Rule 23(e); it also demonstrates a lack of adequacy under Rules 23(a)(4) and (g)(4). This Court has developed this principle throughout multiple cases, of which *Eubank* is merely the most recent. *See* discussion and cited cases at p. 15-16 above. Except in extraordinary extenuating circumstances, a disproportionate allocation of settlement proceeds in a consumer class action precludes Rule 23(e) settlement approval. Class counsel who negotiate such settlements breach their fiduciary duty and are inadequate representatives of the class.[4]

---

[4] Note the limiting principle of "consumer class action"; Markow is not proposing that this rule be applied to 42 U.S.C. § 1983 class actions to enforce civil

When determining whether the settlement was "fair, reasonable, and adequate" under Fed. R. Civ. P. 23(e)(2), the district court recited five factors from *Synfuel*, 463 F.3d at 653. The *Synfuel* test is one helpful means to an end: determining the adequacy of the size of the payment by defendants to the class relative to the value of the release by plaintiffs. But applying the five-factor test is not an end in itself: "a list of factors without a rule of decision is just a chopped salad." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001). Sister circuits have recognized that their similar multi-factor tests are not exhaustive of the Rule 23(e) inquiry. *Dry Max Pampers*, 724 F.3d at 718 (looking beyond Sixth Circuit's seven-factor test to find settlement unfair when it constitutes "preferential treatment" for class counsel); *Baby Prods.*, 708 F.3d at 174 (adding to Third Circuit's nine-factor fairness test a new consideration: "the degree of direct benefit provided to the class"); *Bluetooth*, 654 F.3d at 946 (consideration of eight-factor test "alone is not enough to survive appellate review"). *See also ALI Principles* § 3.05 comment a at 205 (criticizing current case law's multifactor tests).

---

rights. In such situations, where 42 U.S.C. § 1988 or other statutory fee-shifting applies, the Seventh Circuit recognizes that fees should not be mechanically tied to recovery. "Fee-shifting provisions signal Congress' intent that violations of particular laws be punished, and not just large violations that would already be checked through the incentives of the American Rule"; "[i]n this context, we have rejected the notion that the fees must be calculated proportionally to damages." *Anderson v. AB Painting & Sandblasting, Inc.*, 578 F.3d 542, 544-546 (7th Cir. 2009) (internal quotations and citations omitted). Even in individual civil rights cases with fee-shifting and without the concern of fairly representing absent class members, however, this Court requires some consideration of proportionality. *E.g.*, *Cole v. Wodziak*, 169 F.3d 486, 487-88 (7th Cir. 1999).

Here, following *Synfuel* factors, the district court found that "there is no hint of collusion in connection with the proposed settlement" and "the settlement procedure was entirely devoid of collusion" because "the parties' first discussion of fees took place in Judge Andersen's presence only after they had agreed to the terms of settlement for class members." A13; A15. But impermissible self-dealing Markow complained about in this case can occur without the settling parties explicitly conniving in a smoke-filled room to unfairly treat the class.

The fact that fees may not be negotiated until after the rest of the settlement should make no difference. The settling parties are rational actors. Even when the negotiations over fees are severed, the parties know in advance that those negotiations are coming, that the defendants have a reservation price based on their internal valuation of the litigation, and that every dollar negotiated for the class reduces the amount defendants are willing to pay class counsel. As the district court noted, "The defendant certainly has no choice on whom it deals with and numerous incentives to pay its opponent's lawyer more than it otherwise might simply to buy peace." A70. Thus both class counsel and defendants have an incentive to leave extra space for that future negotiation in a bifurcated negotiation, an incentive that is absent when the parties are simply negotiating for a single pot of money to go into a common fund. *Cf. Bloyed v. Gen. Motors Corp.*, 881 S.W.2d 422, 435-36 (Tex. App. 1994); *Bluetooth*, 654 F.3d at 948 (separation of fee negotiations from other settlement negotiations does not demonstrate that a settlement with disproportionate fee proposal is fair); *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Litig.*, 418 F.3d 277, 308 (3d Cir. 2005) (temporal segregation "does not allay… concern[s]"); *see also* Brian Wolfman

and Alan B. Morrison, *Representing the Unrepresented in Class Actions Seeking Monetary Relief*, 71 NYU L. Rev. 439, 504 (1996).

Arm's-length negotiations are necessary, to be sure, but hardly sufficient. For example, *Reynolds v. Beneficial Nat'l Bank* expressly notes that even when "there is no proof that the settlement was actually collusive," a settlement may be objectively unreasonable. 288 F. 3d 277, 283 (7th Cir. 2002). And the opinion in *Eubank*, while highly critical of a "scandalous" settlement, never once refers to conspiracy or "collusion." The question here is one of the objective terms of the settlement, not of the subjective motivations of the settling parties. And this settlement does not pass objective muster.

Arm's-length negotiations protect the interests of the class only with respect "to the amount the defendant will pay, not the manner in which that amount is allocated between the class representatives, class counsel, and unnamed class members." *Dry Max Pampers*, 724 F.3d at 717. In particular, "the defendant cares only about the size of the settlement, not how it is divided between attorneys' fees and compensation for the class. From the selfish standpoint of class counsel and the defendant, therefore, the optimal settlement is one modest in overall amount but heavily tilted toward attorneys' fees." *Eubank*, 753 F.3d at 720.

The district court's acknowledgement that arm's-length negotiations occurred is not a substitute for the necessary inquiry into whether the settlement is impermissibly self-dealing.

The district court's sole consideration of the allocation question was to distinguish *Pampers* as a worse settlement than the one at bar. A11. But as *Eubank* shows, disproportionality can still cause settlement unfairness when class counsel

obtains 56% of the settlement proceeds, not just when it is 90:10 as in *Pampers*. Appellees will no doubt correctly note that this settlement does not have every single problem identified in *Eubank*, just as they distinguished *Pampers* below. But *Bluetooth*, *Pampers* and *Eubank*, like most judicial opinions, create precedential rules of general applicability. They do not stand for the proposition that a settlement need only hop over the low bar of "better than *Pampers*" to pass muster. And while this settlement may not have *Eubank*'s Rule 23(a)(4) problems,[5] *Eubank* stands for broader principles "on multiple grounds" for settlement disapproval.  753 F.3d at 723.

This one-sided settlement is on its face impermissibly self-dealing, ripe with red flags.  In *Eubank*, this Court was inquired into actual claims rates that the parties had failed to provide the district court, made "generous assumptions" as to the actual value of class recovery based on that claims rate, and then rejected the settlement for, among other reasons, its "one-sidedness." At a minimum, however, remand is required for explicit consideration of the "danger signs" of unfairness identified by *Eubank* and other cases, including the actual claims rate and the resulting likely class recovery from a discounted value of the coupons.

**II.     The district court committed reversible error in approving a settlement and fee request that did not comply with 28 U.S.C. § 1712(a).**

28 U.S.C. § 1712 of the Class Action Fairness Act ("CAFA") requires that attorneys' fees in a coupon settlement "attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." The parties'

---

[5] Though it may. *See* Section IV, below.

settlement did not comply with this statutory command, instead creating a segregated

fund and demanding fees be based on that clear-sailing agreement or lodestar. The

lower court created an unnecessary circuit split, erroneously interpreted § 1712 to be

give the district court discretion to choose lodestar methodology, and thus improperly

approved a settlement and fee request that did not comply with CAFA.

**A.**     **The lower court erred interpreting § 1712.**

"Statutory construction must begin with the language employed by Congress."

*Turley v. Gaetz*, 625 F.3d 1005, 1008 (7th Cir. 2010) (quoting *Park 'N Fly, Inc. v. Dollar Park*

*& Fly, Inc.*, 469 U.S. 189, 194 (1985)). When a key term is not defined in the statute,

"[courts] look first to the word's ordinary meaning." *Schindler Elevator Corp. v. United*

*States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011).

*Inkjet* confronted the precise statutory interpretation question as did the district

court here:

> Subsection 1712(a) states, in relevant part, that "the portion of any
> attorney's fee award to class counsel shall be based on the value to
> class members of the coupon that are redeemed." Congress's use of
> the words "any" and "shall" indicate that subsection (a) is not
> permissive.  If the district court awards "any" attorney's fees, and
> those attorney's fees are "attributable to the award of the coupons,"
> then the fees award must be calculated in the manner prescribed by
> § 1712(a) (i.e., using the redemption value of the coupons).

716 F.3d 1173, 1181 (9th Cir. 2013) (citations omitted).[6] *Inkjet* held that "attributable to" plainly meant "to explain as caused or brought about by: regard as occurring in consequence of," *id.* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002)), or, alternatively, "to regard as arising from a particular cause or source; ascribe." *Id.* (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011)). Both of these definitions describe a causal relationship. *See generally Brackett v. Peters*, 11 F.3d 78, 79 (7th Cir. 1993).

Considering these definitions, *Inkjet* held that "attorneys' fees are 'attributable to' an award of coupons where '*the* [singular] award of coupons' is the condition precedent to the award of attorneys' fees." 716 F.3d at 1181 (brackets and emphasis in original) (quoting 28 U.S.C. § 1712(a))). Here, attorneys' fees were caused by nothing if not by the settlement's promise of Southwest drink coupons, which is the only relief that class counsel obtained for the class. Exactly such a scenario was contemplated in *Inkjet*, which invites this Court to "consider a settlement that only provides for coupon relief. In such a case, the portion of any attorneys' fees award that is attributable to the award of the coupons must be one hundred percent. Because the settlement contains only coupons, the fees award cannot be 'attributable to' anything but the coupons." 716 F.3d at 1182.

"An attorney who works incredibly hard, but obtains nothing for the class, is not entitled to fees calculated by any method. … Because it is the class relief that is both a necessary and sufficient condition to an award of attorney's fees, it follows that an

---

[6] This Court similarly notes that "shall" is "mandatory and generally forecloses discretion." *Exelon Generation Co., LLC v. Local 15, IBEW*, 676 F.3d 566, 571 (7th Cir. 2012).

attorneys' fees award can only be 'attributable to,' or the consequence of, class relief, not the attorney's hard work." *Id.* Therefore, "[a]ttorney's fees are *never* 'attributable to' an attorney's work on the action." *Id.* (emphasis in original). Rather, "[t]hey are 'attributable to' the relief obtained for the class." *Id.*

Without pausing to consider the Seventh Circuit's policy that a circuit split should not be created "without strong cause,"[7] the district court's analysis of *Inkjet* began with this passage, arguing that *Inkjet*'s analysis "conflated two distinct issues—entitlement to fees, and the amount of a fee award." A32. In the district court's view, "[e]ntitlement to fees is dependent on, and thus attributable to, the lawyer's success," but success is "only one" factor "in determining the amount of the fee award," and "[i]n the usual 'lodestar' case, the amount of the award is ... attributable to the attorney's work." *Id.*

Notice the district court's subtle redefinition of "attributable to" to mean "dependent on." The district court did not cite to any authority for this definition. But, as discussed above, the phrase "attributable to" connotes a causal or catalytic relationship in its ordinary usage. *See Inkjet*, 716 F.3d at 1181; *Stanford v. C.I.R.*, 152 F.3d 450, 459 (5th Cir. 1998); *Lawinger v. C.I.R.*, 103 T.C. 428, 435 (T.C. 1994) (citing *National Association of Greeting Card Publishers v. United States Postal Service*, 462 U.S. 810, 823 (1983)).

As Professor Yaffe explains,

---

[7] *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995).

> The distinction here can be thought of as a distinction between
> "caused by" on the one hand and "dependent on" on the other. If A
> is caused by B, then A is dependent on B, but A could depend on
> B—could vary when B varies—without being caused by B. Further,
> the fact that A depends on B doesn't rule out the possibility that A
> is caused by, say, C.

Gideon Yaffe, LIBERTY WORTH THE NAME: LOCKE ON FREE AGENCY 36 (2000).

Applying this formulation to § 1712: If the fee award is caused by the coupon

relief, then the fee award is dependent on the coupon relief. Nonetheless, the fee award

could depend on the attorney's labor—could vary when the intensity of labor varies—

without being caused by the attorney's labor. *Inkjet*, 716 F.3d at 1182 ("[A]lthough class

counsel's hard work on an action is presumably a necessary condition to obtaining

attorney's fees … ."). The fact that the fee award depends on the attorney's labor doesn't

change that the fee award is caused by the successfulness of that labor. The lower

court's error was its presumption that fees may be "attributable to" that which is

insufficient to beget the award in the first place—namely, the attorney's labor.

Crucially, *Inkjet* did not conflate "entitlement to fees" with "the amount of the fee

award," A32, because § 1712(a)'s "attributable to" language encompasses both concepts.

Indeed, "[b]ecause it is the class relief that is both a necessary and a sufficient condition

of an award of attorney's fees, it follows that an attorney's fees award can only be

'attributable to' … the class relief." 716 F.3d at 1182. As here, in circumstances where the

only class relief occasioning fees is coupon relief, "the portion of any attorneys' fees

award that is attributable to the award of the coupons must be one hundred percent"

and the entire fee award calculated in accord with § 1712(a)'s percentage of the coupons

redeemed methodology. *Id.* Thus, it is the lower court that conflated the meaning of

"attributable to" with the meaning of "dependent on." Consequently, it glossed over the distinction between a causal relationship and a dependent (necessary but not sufficient) relationship.

In practice, if the district court's interpretation of § 1712(a) is upheld, the utility of CAFA in returning class/attorney equity to coupon settlements would be neutered. *See Inkjet*, 716 F.3d at 1179 (It "cannot be overemphasized" that "the attorneys' fees provisions of § 1712 are intended to put an end to the 'inequities' that arise when class counsel receive attorneys' fees that are grossly disproportionate to the actual value of the coupon relief obtained for the class.") (quoting SEN. REP. NO. 109-14, at 29-32 (2005), reprinted in 2005 USCCAN 3); *Synfuel*, 463 F.3d at 654 (7th Cir. 2006) (citing now-codified 28 U.S.C. § 1711, note §2(a)(3)(A)).

If class attorneys could obtain lodestar awards for themselves when they merely attain coupon relief for class members, then coupon settlements would be placed on par with most other federal lodestar-based fee shifting statutes. The incongruity, of course, is that these lodestar awards are believed to "encourage" a particular type of litigation practice, not discourage it. *See, e.g., Anderson,* 578 F.3d at 545-47. Unlike, for example, civil-rights fee-shifting under 42 U.S.C. § 1988, CAFA is meant to discourage coupon relief.

The district court read § 1712 to reintroduce the misalignment of attorney-client interests that CAFA was expressly combating, a misalignment that been recognized by this Circuit for nearly 30 years. *See Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986) ("This interest-alignment device [(contingent percentage-of-recovery methodology)] is not perfect. … But [an] imperfect alignment of interests is better than a conflict of

interests, which hourly fees may create."). *See generally* Silver, 74 Tul. L. Rev. at 1819

(citing authorities showing a "strikingly broad" "consensus" that percentage approach

harmonizes interests of class counsel and absent class members better than does

lodestar approach).

The district court also argued that § 1712(b), standing alone, "authorizes a

lodestar-based fee" in this case, and that *Inkjet* "read [§ 1712(b)] contrary to its plain

language." A31; A33-34. Not so. Statutes must be construed "in the context of the entire

statutory scheme." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1077 (7th Cir. 2013). While

§ 1712(b), read in isolated segregation, might seem to justify the use of the lodestar fee

in this case, when read in combination with § 1712(a) it does no such thing. § 1712(b)

allows for lodestar when "a portion of the recovery of the coupons is not used to

determine the attorney's fee." However, § 1712(a) and (c) controls when a portion of the

recovery must be used to determine the attorney's fee, as discussed above. It is not

§ 1712(b) that "preclud[es] a lodestar-type award" in this case, A34, but rather it is

§ 1712(a) and (c) that preclude it. Reading § 1712(b) as "authorizing" the use of lodestar

in this instance "would read § 1712(a) completely out of the statute." *Inkjet*, 716 F.3d at

1184. *See generally Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1178 (2013) ("[T]he canon

against surplusage is strongest when an interpretation would render superfluous

another part of the same statutory scheme.").

The district court next argues that the various headings of the statute support its

reading. But the headings of a section cannot limit the plain meaning of the text. *See*

*Inkjet*, 716 F.3d at 1182 n.11 (citing *Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S.

519, 528-29 (1947)). Even if the headings could permissibly be used in this case, they

support both the district court's reading and *Inkjet*'s reading. Subsections (a) and (b) are indeed "constructed as parallel methodologies" for calculating attorney's fees, A34, but the question is not whether § 1712 describes multiple methodologies—it is whether § 1712 also limits discretion to use certain methodologies in certain circumstances. Nothing about the titles of the subsections tells us when a specific methodology is appropriate: a fee is "contingent" if it is only awarded when a lawsuit is successful: the "contingent" nature of the fee award does not speak to whether the lodestar method or the percentage-of-recovery method must be used. BLACK'S LAW DICTIONARY 362 (9th ed. 2009). The lower court's use of the statute's headings only serves to "create artificial uncertainty about the otherwise plain language of § 1712(a)." *Inkjet*, 716 F.3d at 1182 n.11.

Inkjet's interpretation of CAFA is also consistent with Congress' specified purpose. When enacting CAFA, Congress was concerned with the fact that "[c]lass members often receive little or no benefit from class actions, and are sometimes harmed, such as where ... counsel are awarded with large fees, while leaving class members with coupons or other awards of little or no value." 28 U.S.C. § 1711 note § 2(a)(3). The district court's holding "tolerate[s] the precise abuse § 1712 set about to eliminate." *Inkjet*, 716 F.3d at 1186. The district court argues that "Congress's evident purpose" was to prevent excessive fee awards through a percentage approach, A37, but "Congress' intent is found in the words it has chosen to use." *Harbison v. Bell*, 556 U.S. 180, 198 (U.S. 2009) (citing *W. Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 88 (1991) ("The best evidence of [Congress'] purpose is the statutory text adopted by both Houses of Congress and submitted to the President.") (superseded by statute)). When class

counsel seeks fees based on the class's recovery of coupons, as it did here, it must be calculated relative to the number of coupons redeemed.

**B.      The lower court's use of legislative history was improper and incorrect.**

"Where [a statute] contains a phrase that is unambiguous—that has a clearly accepted meaning in both legislative and judicial practice—we do not permit it to be expanded or contracted by the statements of individual legislators or committees." *W. Va. Univ. Hospitals*, 499 U.S. at 98-99. This is the situation here—no one has provided any authority to contradict the Ninth Circuit's interpretation of the phrase "attributable to." The district court did, in passing, define "attributable to" as meaning "dependent on," as discussed above, but absent authority, this is the sort of "idiosyncratic meaning" that does not constitute ordinary meaning. *See Cont'l Can Co., Inc. v. Chicago Truck Drivers, Helpers, & Warehouse Workers Union (Indep.) Pension Fund*, 916 F.2d 1154, 1158 (7th Cir. 1990).

The district court noted at the outset that CAFA "resulted from years of intense lobbying … partisan wrangling, and, following two successful filibusters, fragile compromises." A31. But this is precisely the circumstance where a court should worry that relying on legislative history gives "unelected staffers and lobbyists … the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (superseded on other grounds). Moreover, the Senate Report was released after the passage of CAFA. *Abrego v. Dow Chemical Co.*,

443 F.3d 676, 683 (9th Cir. 2006). This makes it the sort of "subsequent legislative history" that this Court disfavors. *Cont'l Can Co.*, 916 F.2d at 1157.

Further, the district court's understanding of § 1712 was not shared by many members of Congress who voted for CAFA. Given the conflicting understandings of this particular provision at enactment, the Senate Report struggles to "shed a reliable light on the enacting Legislature's understanding" of § 1712. *Exxon Mobil Corp.*, 545 U.S. at 568. The district court's narrow focus on the Senate Report is instead "an exercise in 'looking over a crowd and picking out your friends.'" *Id.* (quoting Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 IOWA L. REV. 195, 214 (1983)). The Report reflects, at most, the view only of the "[t]hirteen Senators who signed [it] ... five [of whom] voted not to send the proposal to the floor." *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448 (7th Cir. 2005) (rejecting the use of CAFA's legislative history). "[L]ikewise, 435 Members of the House and one President kept their silence." *Id.*

Even if it were prudent to look at legislative history in this case, the language quoted by the district court does not support its own interpretation. The district court contends that § 1712(b) permits lodestar to be used even for a coupon-only settlement. A34-35. But the Report says merely that lodestar can be used "in connection with a settlement based *in part* on coupon relief." S. REP. NO. 109-14 at 30 (emphasis added). Yes, class counsel "may decline to propose that attorney's fees be based on the value of the coupon-based relief provided by the settlement" and instead seek a lodestar award. This simply means that if the parties concede *arguendo* that the value of the coupons is zero, they can avoid the redemption calculation, and seek a lodestar calculation based

on the non-coupon relief in the settlement. *E.g., In re HP Laser Printer Litig.*, 2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) (using lodestar after excluding coupons from fee calculation). But if the coupons are needed as a basis for the attorneys' fees, then a court must use § 1712(a) or § 1712(c) to calculate the value of the coupons and fees attributable to the coupons. The alternative is to "tolerate the precise abuse § 1712 set about to eliminate." *Inkjet*, 716 F.3d at 1186.

~~~

Section 1712(a) dictates the fee award in this case. Because the parties structured the settlement to avoid the § 1712(a) protections for the class to the unfair benefit of class counsel, the settlement could not be approved, and it was reversible error both to fail to apply § 1712(a) and to approve the settlement.

### III.    Markow did not waive his objections to settlement approval.

At all times, Markow objected to settlement approval. A147. He specifically objected that the presence of a clear-sailing agreement along with a segregated fee fund meant that the settlement was structurally unfair to the class under *Bluetooth*, because excessive fees would be returned to Southwest instead of the class. A140. He specifically argued that the likely disproportionate allocation between the class and the attorneys made the settlement unfair, and that the settlement did not comply with CAFA. A137; A140; A197.

At the fairness hearing, the district court asked Markow to summarize his objection "in the next 30 seconds" and asked "do you have a view on anything other than the attorney's fees on the part that the class members are getting?" A168-69.

MS. HOLYOAK: We did, and I can rely on the papers for that, but, yes, I did—we did object to the incentive awards.

Oh, to the amount?

THE COURT: Yes. Forget the incentives. I'm just talking about the whole thing about giving them a coupon.

MS. HOLYOAK: No, not to that.

THE COURT: You don't have a problem with that. You object to the incentive awards and you object to the fees.

MS. HOLYOAK: Yes.

A169. Southwest contended below (in a futile attempt to get a ruling on intervention from the district court that would require Markow to engage in a collateral appeal) that the fact that Markow acknowledges he does not object to "the whole thing about giving them a coupon" means that he waived all of his other arguments against settlement fairness and was solely objecting to the fees. A208. The district court entertained Southwest's characterization of Ms. Holyoak's ambiguous response to his demand to summarize "in the next 30 seconds," while acknowledging that it had no authority to restrict the scope of an appeal. A205; A211 ("It will be up to the court of appeals, of course, to determine what, if anything, Markow waived or forfeited.").

There is no waiver.

That brief response to the court's question is not the sort of deliberate, clear, and unambiguous statement evincing an intentional waiver that has been held sufficient to constitute a judicial admission. *See Crowe v. Coleman*, 113 F.3d 1536, 1542 (11th Cir. 1997) ("waivers and concessions made in appellate oral argument need to be unambiguous before they are allowed to change the outcome of an appeal from a reversal to an

affirmance."); *see also Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001) ("A statement made by counsel during the course of trial may be considered a judicial admission if it was made intentionally as a waiver, releasing the opponent from proof of fact."); *MacDonald*, 110 F.3d at 340 (declaring that "[i]n order to qualify as judicial admissions, an attorney's statements must be deliberate, clear, and unambiguous" and must constitute a deliberate voluntary waiver.); *Moose Lodge No. 107 v. Irvis*, [407 U.S. 163, 170 (1972)] ("[W]e are loath to attach conclusive weight to the relatively spontaneous responses of counsel to equally spontaneous questioning from the Court during oral argument."). In fact, [Markow] never repudiated the arguments in [his] brief …. [T]he statement at issue here cannot be characterized as an unambiguous, intentional waiver of the arguments made in [Markow's] brief.

*McCaskill v. SCI Management Corp.*, 298 F.3d 677, 682 (7th Cir. 2002) (Rovner, J., concurring). *Accord Fraternal Order of Police Lodge No. 89 v. Prince George's County*, 608 F.3d 183, 189-90 (4th Cir. 2010) ("Although a lawyer's statements may constitute a binding admission of a party, any such statement must be 'deliberate, clear, and unambiguous' before we will afford it preclusive effect. *Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 265 n.2 (4th Cir. 2004) (alteration and internal quotation marks omitted).").

*See also Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010) (factual judicial admissions).

Markow's counsel in the same exchange expressly relied upon the papers. After the fairness hearing, Markow drew attention to *Pampers,* and its endorsement of Markow's position that settlement approval requires fair allocation. Though Markow does not object to a coupon settlement *qua* coupon settlement that complies with § 1712, he did and does object to the unfair reversion to Southwest and the unfair "one-

sidedness" of the disproportionate allocation. A140. The waiver of one possible argument against settlement approval did not waive all other arguments against settlement approval. At worst, Markow's counsel gave an ambiguous response to an ambiguous question under the time pressure imposed by the district court. But by definition that's not "intentional and unambiguous," much less "deliberate."

In briefing below, Southwest relied upon *Taubenfeld v. AON Corp.*, 415 F.3d 597 (7th Cir. 2005), but that case is inapposite. In *Taubenfeld*, the objector not only failed to make oral argument on an objection, but failed to brief it. *Id.* at 599. That is not true here, where Markow briefed the objection (citing *Bluetooth* and *Vought v. Bank of Am.*, No. 10-cv-2052, 2012 U.S. Dist. LEXIS 143595, at *81-82 (C.D. Ill. Oct. 4, 2012)), and renewed the objection in supplemental briefing when new precedent arose (citing *Pampers*), and expressly referred the district court to his briefs. A140; A137; A197; A169. "A litigant does not forfeit a position just by neglecting to cite its best authority …" *Dixon v. ATI Ladish LLC*, 667 F.3d 891, 895 (7th Cir. 2012). If that is true when a litigant neglects to cite its best authority, it is surely true when the litigant *does* cite the best authorities. *Cf. also Bew v. City of Chicago*, 252 F.3d 891, 895-96 (7th Cir. 2001). Had Markow failed to brief the disproportionality argument or reversion arguments he raises on appeal, Southwest might have something to complain about by Markow's failure to mention them at an abbreviated fairness hearing. But as Markow briefed these issues and identified the relevant precedents, he preserved his objections—especially when counsel incorporated the briefs by reference at the fairness hearing.[8]

---

[8] Too, the district court expressly permitted Markow to intervene based on his timely filed papers. A211.

Those papers preserved the arguments he makes on appeal. A137; A140; A197. There is no waiver or forfeiture.

## IV.   An undisclosed conflict of interest should have precluded class certification.

No one below inquired into the relationship between lead plaintiff Adam J. Levitt and class counsel Joseph Siprut, but at the time of the fairness hearing, the two were co-counsel in a class action in the Northern District of California where the complaint was filed March 13, 2013, with both designated "lead attorney" status. *Hodges v. Apple, Inc.*, No. 3:13-cv-01128, appeal pending No. 14-15106 (9th Cir.).[9] *See also* Class certification was thus inappropriate. *Eubank*, 753 F.3d at 722-24; *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253-55 (11th Cir. 2003) (*former* business partner of class counsel could not be class representative under Rule 23(a)(4)).

This relationship of divided loyalties was never disclosed to the district court or the class. Because of the lack of notice, Markow did not learn of and did not object to the Rule 23(a)(4) problem below, and the district court had no opportunity to consider it. While this would normally be forfeiture, because this is a pure legal issue this Court has the discretion to consider it nevertheless. *Dechert v. Cadle Co.*, 441 F.3d 474, 476 (7th Cir. 2006).

That discretion should be equitably exercised here for two reasons.

*First*, this Court can take judicial notice of another federal court's docket. *Opoka v. INS*, 94 F.3d 392, 394-95 (7th Cir. 1996). There is thus no prejudice from the lack of factual development below, and this Court can take briefing and decide whether a co-

[9] *See also Maciel v. General Motors, LLC*, No. 4:14-cv-01339-JSW (N.D. Cal.).

counsel relationship in a potentially lucrative pending class action is a *per se* disqualifying conflict as *London* and *Eubank* suggest. *Bailey v. International Brotherhood of Boilermakers*, 175 F.3d 526, 529-30 (7th Cir. 1999).

*Second*, class counsel agreed to an "incomplete and misleading" class notice that failed to disclose the conflict of interest. *Eubank*, 753 F.3d at 728. If class counsel does not have an affirmative duty to disclose such conflicts and can profit from the lack of disclosure, objectors must engage in wasteful fishing expeditions of discovery to learn of possible conflicts' existence, lest the issue be forfeited. Such a result would both penalize good-faith class counsel and good-faith objectors, reward class counsel and representatives who engage in impermissible shenanigans, and incentivize class counsel to hide the ball from their fiduciaries as was attempted here and in *Eubank*. (If the Court nevertheless adopts that rule and finds forfeiture, Markow asks that its opinion establishes with clarity that objectors have the right to engage in that discovery.)

The conflict here is not as blatant as *Eubank*'s, but it's blatant enough. Levitt's conflict of interest with the class precludes Rule 23(a)(4) adequacy--a conflict that actually injured the class when Levitt agreed to a settlement that primarily benefited class counsel.

## Conclusion

For the several independent reasons identified above, this Court should vacate and reverse the settlement approval, holding the settlement must be rejected. At a minimum remand is required for the settlement fairness to be determined on the proper

legal standards, including ensuring that class counsel is not the settlement's primary beneficiary.

Dated: August 15, 2014                    Respectfully submitted,

                                          /s/ Theodore H. Frank
                                          Theodore H. Frank
                                          CENTER FOR CLASS ACTION FAIRNESS
                                          1718 M Street NW, No. 236
                                          Washington, DC 20036
                                          Telephone: (703) 203-3848
                                          Email: tfrank@gmail.com
                                          *Attorney for Appellant Gregory Markow*

                                          LAW OFFICES OF DARRELL PALMER PC
                                          Joseph Darrell Palmer
                                          603 North Highway 101, Suite A
                                          Solara Beach, CA 92075
                                          (858) 792-5600
                                          *Attorney for Appellant Alison Paul*

**Statement Regarding Oral Argument**

Pursuant to Cir. R. 34(f), Markow requests that the Court hear oral argument in his case because it presents significant issues concerning settlements in class action cases. Exploration at oral argument would aid this Court's decisional process and benefit the judicial system.

Markow brings this objection and appeal in good faith to overturn an unlawful settlement. Markow's attorney has previously argued and won landmark appellate rulings on the interpretation of CAFA and improving the fairness of class-action and derivative-settlement procedure. *E.g.*, *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014); *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012); *In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013); *In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). A favorable resolution in this case would improve the class action process by deterring other class-action settlements designed to benefit attorneys at the expense of their putative clients.

**Certificate of Compliance**
**with Fed. R. App. 32(a)(7)(C) and Circuit Rule 30(d)**

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, Type Style Requirements, and Appendix Requirements:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13,706 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 12-point Palatino font.

3.      All materials required by Cir. R. 30(a) & (b) are included in the appendix.

Executed on August 15, 2014.

*/s/ Theodore H. Frank*
Theodore H. Frank
Center for Class Action Fairness
1718 M Street NW, No. 236
Washington, DC 20036
Telephone: (703) 203-3848
Email: tfrank@gmail.com

*Attorney for Appellant Gregory Markow*

**Proof of Service**

I hereby certify that on August 15, 2014, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, thereby effecting service on counsel of record who are registered for electronic filing under Cir. R. 25(a).


Executed on August 15, 2014.

/s/ *Theodore H. Frank*

Theodore H. Frank

Center for Class Action Fairness

1718 M Street NW, No. 236

Washington, DC 20036

Telephone: (703) 203-3848

Email: tfrank@gmail.com

*Attorney for Appellant Gregory Markow*

# Required Short Appendix

**Statement of Compliance**
**with Circuit Rule 30(d)**

All materials required by Cir. R. 30(a) & (b) are included in the Appendix of

Appellants Gregory Markow and Alison Paul.

/s/ Theodore H. Frank

Theodore H. Frank

CENTER FOR CLASS ACTION FAIRNESS

1718 M Street NW, No. 236

Washington, DC 20036

Telephone:  (703) 203-3848

Email:  tedfrank@gmail.com

*Attorney for Appellant Gregory Markow*

<u>APPENDIX</u>
<u>TABLE OF CONTENTS</u>

<u>Appendix Page</u>

Memorandum Opinion and Order of
The Honorable Matthew F. Kennelly
      filed August 26, 2013 (Docket No. 141) . . . . . . . . . . . . . . . . . . . . . . . .  A1

Memorandum Opinion and Order of
The Honorable Matthew F. Kennelly
      filed October 3, 2013 (Docket No. 152)  . . . . . . . . . . . . . . . . . . . . . . .  A23

Final Judgment of
The Honorable Matthew F. Kennelly
      filed October 10, 2013 (Docket No. 156)  . . . . . . . . . . . . . . . . . . . . . .  A50

Memorandum Opinion and Order of
The Honorable Matthew F. Kennelly
      filed June 20, 2014 (Docket No. 232)  . . . . . . . . . . . . . . . . . . . . . . . . .  A60

APPENDIX
TABLE OF CONTENTS

Appendix Page

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A76

Amended Stipulation of Settlement,
With Notice of Filing,
      filed December 7, 2012 (Docket No. 88) . . . . . . . . . . . . . . . . . . . . . . A94

Notice of Parties' Agreement on Attorney's Fees
      filed January 17, 2013 (Docket No. 90) . . . . . . . . . . . . . . . . . . . . . . A125

Gregory Markow's Objection to Class Settlement in No. 1-11-cv-8176,
With Attachment,
      filed April 10, 2013 (Docket No. 105) . . . . . . . . . . . . . . . . . . . . . . . A128

      Attachment:

      Declaration of Gregory Matthews
            sworn April 10, 2013 (Docket No. 105-1) . . . . . . . . . . . . . . . A149

Alison Paul's Objection and Notice of Joinder,
With Exhibit,
      filed April 11, 2013 (Docket No. 110) . . . . . . . . . . . . . . . . . . . . . . . A151

      Exhibit:

      A.      Mailed Notice to Alison Paul
                  dated January 17, 2013 (Docket No. 110-1) . . . . . . . . A153

Aii

Transcript of Trial Proceedings before
The Honorable Matthew F. Kennelly
on May 23, 2013  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A155

Proceedings heard in open court  . . . . . . . . . . . . . . . . . . . . . . . . . .  A157

Gregory Markow's Notice of Pertinent Authority
[Pages 1-2]
filed August 9, 2013 (Docket No. 138) . . . . . . . . . . . . . . . . . . . . . . .  A196

Gregory Markow's Notice of Filing Claim,
With Attachment,
filed September 19, 2013 (Docket No. 142) . . . . . . . . . . . . . . . . . . .  A198

Attachment:

Declaration of Gregory Markow,
With Exhibit,
sworn September 19, 2013 (Docket No. 142-1)  . . . . . . . . . .  A200

Memorandum Opinion and Order of
The Honorable Matthew F. Kennelly
filed December 6, 2013 (Docket No. 201)  . . . . . . . . . . . . . . . . . . . .  A203

Gregory Markow's Second Amended Notice of Appeal
filed July 18, 2014 (Docket No. 241) . . . . . . . . . . . . . . . . . . . . . . . . .  A212

Amended Notice of Appeal of Alison Paul
filed July 18, 2014 (Docket No. 244) . . . . . . . . . . . . . . . . . . . . . . . . .  A214

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: SOUTHWEST AIRLINES | ) | Case No. 11 C 8176 |
| VOUCHER LITIGATION | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In November 2011, Adam Levitt and Herbert Malone filed suit against Southwest

Airlines Co. on behalf of a class of similarly situated Southwest customers.  They filed

the case in federal court pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. §

1332(d)(2).  Levitt and Malone alleged that Southwest committed a breach of contract,

was unjustly enriched, and violated various state consumer protection laws when, on

August 1, 2010, it stopped honoring drink vouchers that it had given to travelers who

purchased premium-priced "Business Select" tickets.  These vouchers were

redeemable on any Southwest flight for an alcoholic drink that would otherwise cost five

dollars.  Plaintiffs alleged that the drink vouchers had no expiration date at the time

Southwest issued them.

After a significant period of contested litigation, the parties engaged in mediation,

conducted by Wayne Andersen, a highly respected retired judge of this court.  The

parties agreed to a class-wide settlement of plaintiffs' claims, including a process for

class members to obtain replacement drink vouchers and injunctive relief regarding

future voucher programs.  The parties initially agreed that plaintiffs' counsel would

submit a petition for fees to the Court for adjudication.  Southwest later agreed not to

oppose a fee petition in the amount of $3 million.  The Court preliminarily approved the

settlement in December 2012 and approved a program of individual notice to potential

class members, combined with publication notice.

Plaintiffs have moved for final approval of the proposed class settlement, which

includes incentive awards for Levitt and Malone.  Plaintiffs' counsel have also petitioned

for an award of attorney's fees and costs.  A number of class members have objected to

the settlement or to the proposed fee award.  For the reasons stated below, the Court

grants final approval of the settlement agreement, including the proposed incentive

awards for the class representatives.  The Court will issue a separate decision

concerning the petition for attorney's fees and costs.

**Background**

As indicated above, plaintiffs filed this suit in November 2011.  In January 2012,

the Court granted plaintiffs' motion to strike all but one of Southwest's affirmative

defenses.  Two months later, in March 2012, the Court granted Southwest's motion to

dismiss as to three of plaintiffs' four claims.  This left standing only plaintiffs' breach of

contract claim.

The parties then engaged in discovery.  Both sides served and responded to

interrogatories and requests for production of documents.  Southwest took the

depositions of Levitt and Malone, and plaintiffs' counsel took the depositions of various

Southwest employees.

The parties then entered into settlement negotiations.  They engaged in a two-

day mediation session with retired Judge Wayne Andersen and reached an agreement

to settle the claims of the plaintiff class.  The proposed settlement defines the

settlement class as including all Southwest customers who purchased a drink voucher through the purchase of a Business Select ticket before August 1, 2010 but did not redeem the voucher. The settlement allows each class member to submit a proof of claim form and supporting documentation in order to receive one replacement drink voucher for each unredeemed drink voucher. Each replacement voucher expires one year after its date of issuance.

In addition to compensating class members directly, the settlement includes provisions that amount to injunctive relief against Southwest. Specifically, the agreement includes the following requirements. First, if Southwest issues any drink vouchers following the settlement that do not include an expiration date, it must honor those vouchers on any Southwest flight at any time. This would essentially prevent Southwest from repeating what it is alleged to have done with the vouchers at issue in this case. Second, Southwest must honor the expiration dates printed on post-settlement drink vouchers and may not retroactively invalidate them. Third, if Southwest issues drink vouchers and limits their use to the date of the flight for which the ticket was issued, it must include conspicuous language on post-settlement drink vouchers stating this.

Finally, the proposed settlement of the class members' claims includes an agreement by Southwest to pay incentive awards of $15,000 each to the two named plaintiffs, Levitt and Malone.

After negotiating the proposed settlement of the class members' claims, plaintiffs and Southwest separately negotiated regarding attorney's fees for class counsel, again with the assistance of retired Judge Andersen. It is undisputed that there was no

negotiation regarding attorney's fees until after the parties had reached agreement on settlement of the class members' claims. By the time of the Court's preliminary approval of the settlement, plaintiffs and Southwest had reached an agreement that, subject to court approval, Southwest would pay class counsel fees of no less than $1.75 million and no more than $7 million and would reimburse counsel's costs and expenses up to $30,000. The notice of the proposed settlement that was sent to class members referenced this agreement.

Following the Court's preliminary approval of the settlement, the parties continued their negotiations regarding attorney's fees, again with the assistance of Judge Andersen. Southwest ultimately agreed not to oppose a fee request of up to $3,000,000 plus out of pocket expenses of up to $30,000.

The parties have now moved for final approval of the settlement. Plaintiffs have filed a separate motion seeking $3 million in attorney's fees, $30,000 in costs, and the proposed $15,000 incentive awards for the two named plaintiffs. Various class members have submitted objections. The Court held a fairness hearing on May 21, 2013.

## Discussion

As indicated earlier, the Court considers in this decision the fairness of the settlement of the class members' claims as well as the proposed incentive awards for the class representatives. The Court will address separately the proposed award of attorney's fees and costs.

### A.    The objections

The notice to the class set a deadline for submission of objections. Timely

objections were submitted by Gregory Psoinos, Michael Tigar, Eric Timmons, John

Stevens, William Campbell, Richard Durante, Lisa Kristel, Courtney Moriarta, Dennis

Coyne, Gregory Markow, Jonathan Fortman, Alison Paul, Daniel Sibley, and Dennis

Gibson and Gleith Cozby (jointly). Several other apparent objections were sent to one

or more of the attorneys, but these did not meet the preliminary approval order's

requirements for objections. In addition, certain of the objectors – Stevens, Durante,

and Kristel – have opted out of the settlement. Thus they lack standing to object to its

approval. The Court has nonetheless considered the points made by all of those who

submitted objections.

**B.    Certification of the proposed settlement class**

The proposed settlement class is defined as follows:

All Southwest Customers who purchased an Eligible Drink Voucher
through the purchase of a Business Select ticket or otherwise, during the
time period before August 1, 2010, but who did not redeem the Eligible
Drink Voucher.

The Settlement Class does not include Southwest customers who
obtained drink vouchers or drink coupons through the Southwest Rapid
Rewards program or as a result of being a member of the Southwest
Rapid Rewards program, unless those customers separately purchased,
but did not redeem, Eligible Drink Vouchers through the purchase of a
Business Select ticket or otherwise.

The first question is whether the class meets the requirements for class

certification set forth in Federal Rule of Civil Procedure 23. A court may certify a class if

the party seeking certification meets all the requirements of Rule 23(a) and the

requirements of Rule 23(b)(1), (2), or (3). *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 513

(7th Cir. 2006). Rule 23(a) requires the party seeking certification to demonstrate that

the members of the class are so numerous that joinder of all of them is impracticable

(numerosity); there are questions of law or fact common to the proposed class

(commonality); the class representative's claims are typical of the claims of the class

(typicality); and the representative will fairly and adequately represent the interests of

the class (adequacy of representation).  Fed. R. Civ. P. 23(a)(1)–(4).  Rule 23(b) sets

forth four circumstances under which a class action may be maintained.  In this case,

the parties rely on Rule 23(b)(3), which permits class certification if "questions of law or

fact common to class members predominate over any questions affecting only individual

members" and class resolution is "superior to other available methods for fairly and

efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### 1.     Rule 23(a) requirements

It is undisputed that the proposed class meets the numerosity requirement.  Over

two million individuals were affected by Southwest's decision to stop honoring the

vouchers.

The Court addresses the other three Rule 23(a) factors together because they

are interrelated.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. at 591, 626 n. 20

(1997) ("The adequacy-of-representation requirement 'tend[s] to merge' with the

commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for

determining whether ... maintenance of a class action is economical and whether the

named plaintiff's claim and the class claims are so interrelated that the interests of the

class members will be fairly and adequately protected in their absence.'").  In addition,

certain objectors oppose the proposed settlement on grounds that implicate each of

these requirements.

Rule 23(a)'s commonality requirement "requires the plaintiff to demonstrate that

the class members 'have suffered the same injury' . . . ."  *Wal-Mart Stores, Inc. v.*

*Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S.

147, 157 (1982)).  "Their claims must depend on a common contention" that "must be of

such a nature that it is capable of classwide resolution – which means that

determination of its truth or falsity will resolve an issue that is central to the validity of

each one of the claims in one stroke."  *Id.*

A named plaintiff satisfies the typicality requirement when his claim and those of

the class members have a common legal theory, even if there are some factual

variations.  *Oshana*, 472 F.3d at 514.  To put it another way, "[a] plaintiff's claim is

typical if it arises from the same event or practice or course of conduct that gives rise to

the claims of other class members and his or her claims are based on the same legal

theory."  *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983).

Finally, the adequacy of representation requirement involves two inquiries:  the

plaintiffs' attorney must be qualified, experienced, and capable of conducting the

litigation (this is undisputed in the present case), and the named plaintiffs must not have

interests antagonistic to those of the class.  *See, e.g., Rosario v. Livaditis*, 963 F.2d

1013, 1018 (7th Cir. 1992).  This requirement is intended to "uncover conflicts of interest

between the named parties and the class they seek to represent."  *Amchem Prods.*, 521

U.S. at 625.

The claims of the proposed class satisfy these requirements.  Each class

member suffered the same injury, namely, the loss of the ability to use the drink

vouchers.  The claims of all of the class members depend on a key common question,

specifically, whether Southwest's decision to stop honoring the drink vouchers amounts

to a breach of contract.  All class members' claims arise from the same alleged conduct – Southwest's decision to no longer honor the drink vouchers – and they are based on the exact same breach of contract theory.  There is no serious contention that the legal theory would vary based on the class members' different states of residence or other individual factors.

Class member Michael Tigar, an attorney and law professor, has objected to certification of the settlement class and to approval of the settlement agreement on the ground that the class fails to meet certain of the requirements of Rule 23.[1]  Specifically, Tigar argues that because the drink vouchers are less valuable to some class members than others and have no value to some class members, there is insufficient cohesiveness among the members of the class.

Tigar's arguments lack merit.  It is beyond question that the claims of each and every class member are based on the same facts:  the terms under which Southwest issued the drink vouchers, and its decision to no longer honor them.  It is likewise beyond question that the claims of each and every class member share key common questions, namely whether Southwest's actions amounted to a breach of contract and, if so, what remedy is appropriate.  Levitt and Malone no doubt have a higher level of interest in obtaining relief than all or the overwhelming majority of the other class members.  This, however, is undoubtedly true of the named plaintiffs in virtually every class action.  It is not a basis to say that the class representatives' claims are atypical or that they are less than adequate representatives.

---

[1] Other objectors make reference to Rule 23's requirements, but Tigar's objections are the most developed.  The Court has considered all of the objections in addressing the requirements of Rule 23.

The core of Tigar's argument seems to be that class treatment of the claims is inappropriate because different class members attach different values to the lost drink vouchers:  some likely considered the vouchers an important component of the "Business Select" package; some likely viewed it as less important, but still a factor worth something; and others likely had no intention of ever using the vouchers and participated in the Business Select program for other reasons.  Tigar's premise cannot plausibly be disputed; of course different class members would value the vouchers differently.  But Tigar has cited no authority, nor is the Court aware of any, supporting the proposition that commonality, typicality, or adequacy of representation is lacking simply because some class members may subjectively attach different values to what they lost due to a breach of contract of which they all were victims.  Tigar likewise cites no authority for the proposition that the amount of damages awarded in an action for breach of a contract that involves the transfer of an item that has an ascertainable dollar value would vary based on the suing party's subjective view of what the voucher was worth to him.

The Court also notes that because the core of the settlement involves returning to the class members exactly what they lost – a drink voucher – variations in how class members might value the voucher is an insignificant factor.  Specifically, those who valued the voucher highly will use it, those who attached no value to it will not use it, and others may or may not do so.  Because each class member who submits a claim will be returned to essentially the position he was in prior to Southwest's decision not to honor the vouchers, the fact that some might have considered the voucher to be a

worthless piece of paper has no real impact on the Rule 23(a) analysis.[2]  As

Southwest's counsel have aptly put it, "A Class Member who does not drink of course

receives no value from the Settlement personally (except for the ability to donate drink

coupons to someone else), but neither did such a Class Member lose any value in his

unredeemed drink coupons, since he never intended to use them."  Submission of

Southwest Airlines (dkt. no. 121) at 27-28.

One objector, Gregory Markow, argues that the class representatives do not

meet Rule 23's adequacy of representation requirement.  Markow bases this objection

on the proposed incentive awards, and in particular on the disparity between the

amounts the two class representatives would receive as compared to other class

members, and as compared to their actual damages.  Markow argues that the incentive

awards "deprive[ ] the representatives of any incentive to ensure an equitable

settlement."  *See* Markow's Not. of Pertinent Authority (dkt. no. 138) at 2.

Markow's argument might make sense if the proposed settlement provided the

class members with nothing or with illusory benefits as compared with their own likely

damages.  That was the situation in the cases on which Markow principally relies.  In

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006), the proposed

settlement provided class members with $1, as compared with the potential for statutory

damages of $100 to $1,000 per person, while providing $3,000 to the class

representative.  In *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 882 (7th

---

[2] Those particular plaintiffs presumably will not use the vouchers, and they will be no
worse off than they were before.  And no hypothetical plaintiff who considered the
original voucher worthless could, under Tigar's theory, legitimately complain about not
getting money from the settlement as opposed to a voucher, because (following that
theory) that particular hypothetical plaintiff lost nothing of value and thus would not be
entitled to recover money.

Cir. 2000), the 200,000 class members were to get nothing, and the class

representative was to receive $2,000.  And in *In re Dry Max Pampers Litig.*, ___ F.3d

___, No. 11-4156, 2013 WL 3957060 (6th Cir. Aug. 2, 2013), the class members were

offered what the court called "nothing but illusory injunctive relief," whereas the class

representatives were offered $1,000 per child who had used the product.  The same is

not true here.  As the Court has stated, the settlement in this case offers the class

members exactly what they lost, namely drink vouchers.  Thus although the proposed

incentive payments *theoretically* might have given Levitt and Malone a disincentive to

negotiate an adequate settlement for class members, that is not how it actually worked

out.  To put it in simple terms, there is not so much as a hint of a sell-out.  Indeed,

Markow does not identify in his objection any way in which the benefit to the class

members could or should be improved, other than a complaint about the time limit for

submitting claims.

    The Court will address separately the particular amount of the proposed incentive

awards.  For present purposes, however, the record does not support Markow's

contention that the awards undermine the adequacy of the class representatives.  The

Court finds that Levitt and Malone are adequate class representatives and that class

counsel are adequate legal counsel for the class.

    For the reasons stated above, the Court overrules the objectors' arguments and

finds that plaintiffs have satisfied all of the requirements of Rule 23(a).

## 2.    Rule 23(b) requirements

    Plaintiffs request certification of the proposed class under Rule 23(b)(3), which

requires a showing that the common questions "predominate over any questions

affecting only individual members" and that a class action is "superior to other available method for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3). This inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy," with the purpose being to determine whether a proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623.  The factors considered include the class members' interest in prosecuting separate actions; the extent and nature of any other litigation over the controversy; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and any likely difficulties in managing a class action. *See* Fed. R. Civ. P. 23(b)(3)(A)-(D).  The last of these factors diminishes in importance when the request is for settlement-only class certification.  *Amchem Prods.*, 521 U.S. at 620.

Each of these factors favors certification of the proposed class.  There is no other pending litigation, and any given plaintiff's individual stake in the outcome is so small that separate suits are impracticable.  When Rule 23(b)(3) was adopted, its drafters "had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  *Amchem Prods.*, 521 U.S. at 617 (internal quotation marks omitted).  Concentrating the claims into a single forum is the only realistic way of vindicating the class members' rights.

For these reasons, the Court concludes that the proposed class meets the requirements for certification under Rule 23(b)(3).

**B.    Approval of proposed settlement**

A court may approve a class action settlement only upon a finding that the

settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  This requires

consideration of a number of factors, including:  (1) the strength of the plaintiff's case

compared to the amount of defendants' settlement offer; (2) the complexity, length, and

expense of continued litigation; (3) the amount of opposition to the settlement; (4) the

presence of collusion in gaining a settlement; (5) the stage of the proceedings and the

amount of discovery completed.  *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463

F.3d 646, 653 (7th Cir. 2006).  The "most important factor" is the first – the relative

strength of plaintiffs' case on the merits balanced against the amount offered in the

settlement."  *Id.*

### 1.    Strength of plaintiffs' case as compared to settlement offer

In considering the strength of plaintiffs' case, legal uncertainties at the time of

settlement favor approval.  *See id.* ("In conducting this analysis, the district court should

begin by quantifying the net expected value of continued litigation to the class.")

(internal quotation marks omitted).  Plaintiffs' claims seem relatively clear-cut, but there

are some uncertainties.  In particular, Southwest has contended that it never intended to

allow holders of the vouchers to redeem them indefinitely.  Thus there is arguably some

potential uncertainty regarding the terms of the contract on which plaintiffs' claims are

based.  The Court is constrained to say, however, that this would not appear to have

been a terribly high hurdle for plaintiffs to clear.

The key factor in this particular case is that the proposed settlement calls for a

full-value, one-to-one reimbursement of drink vouchers for class members and allows

class members to sell or otherwise transfer the new vouchers should they desire.

Though the replacement vouchers will have a limited duration, that duration is

sufficiently long to permit the vast majority of class members to redeem the vouchers if they wish to do so, or to sell them or give them away if they do not want to use them or lack the opportunity to do so.  In short, even if plaintiffs faced few uncertainties in proving their claims, the fact that they get back almost exactly what they lost weighs heavily in favor of approval of the proposed settlement.

> **2.    Complexity, length, and expense of future litigation**

If the Court approves the settlement agreement, this case will, of course, come to an end, and the class members will realize both immediate and future benefits as a result.  Were the Court to deny approval, however, protracted litigation would ensue. Among other things, a battle over class certification would be a virtual certainty with no guaranteed outcome – given that manageability concerns, which drop out of the balance when a settlement-only class is proposed, would come back into consideration. The Court finds that this factor supports approval of the proposed settlement.

> **3.    Amount of opposition**

The settlement administrator in this case sent individual notices to 2,468,646 class members.  Of that number, only thirteen individuals have objected to the settlement and only seventy-three have opted out.  In total, that amounts to less than 0.01%.  Such a low level of opposition supports the reasonableness of the settlement. *See, e.g., In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (holding that the fact that more than "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlement"). The Court does not find persuasive objector Markow's argument that the terms set forth in the class notice made it unreasonably difficult to assert a proper objection.

A14

### 4.    Absence of collusion

There is no hint of collusion in connection with the proposed settlement.  The

parties litigated this case vigorously before entering into settlement discussions.  And

they reached a settlement only after engaging in two full-day mediation sessions.  The

mediator, retired judge Wayne Andersen, reports that these sessions were contentious

and that attorney's fees were not discussed at any time during negotiations over the

terms of relief to class members.  *See* Decl. of Hon. Wayne Andersen (Ret.), Dkt. Entry

125-6.  Indeed, the parties' first discussion of fees took place in Judge Andersen's

presence only after they had agreed to the terms of settlement for class members.  The

Court is thus satisfied that the settlement procedure was entirely devoid of collusion.

This factor weighs in favor of approving the settlement.

### 5.    Stage of proceedings and amount of discovery completed

The last factor that the Seventh Circuit considers relevant is the stage of the

proceedings and the amount of discovery completed.  This factor is relevant because it

determines "how fully the district court and counsel are able to evaluate the merits of

plaintiffs' claims."  *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305,

325 (7th Cir. 1980).

Plaintiffs filed this case in 2011.  After filing, the parties litigated defendants'

motion to dismiss and plaintiffs' motion to strike certain affirmative defenses.  In the

months that followed, both parties served and responded to written discovery requests

and conducted a number of depositions.  And as indicated above, the parties engaged

in intensive negotiations through mediation, including the exchange of multiple written

settlement proposals.  As a result, the parties and this Court are well positioned to

assess the strength of this case and the merits of plaintiffs' claims.

### 6.    Objections to the settlement

As indicated earlier, thirteen class members have submitted objections in which

they argue that the Court should not approve the proposed settlement.  The Court has

addressed some of the objectors' points in discussing the factors outlined by the

Seventh Circuit for approval of a proposed class settlement.  The Court addresses here

the remaining salient points made by the objectors, except for those concerning the fees

requested by plaintiffs' counsel, which the Court will address in a separate order.

### a.    Meaningful and appropriate relief

Several objectors contend that a settlement is appropriate only if it provides cash

recovery and that this proposed settlement is therefore unreasonable.  Though there

has been considerable and justified criticism of coupon-based settlements, the fact is

that there is no ban on or presumption against settlements that provide in-kind

compensation.  Indeed, the provisions of CAFA, which the Court addresses later in this

decision, contemplate that coupon-based settlements will continue.  *See* 28 U.S.C.

§1712(e) ("In a proposed settlement under which class members would be awarded

coupons, the court may approve the proposed settlement only after a hearing to

determine whether, and making a written finding that, the settlement is fair, reasonable,

and adequate for class members.").  As the Ninth Circuit recently stated, "[t]he

legislative history of CAFA makes clear that Congress did 'not intend to forbid all non-

cash settlements.'  Indeed, coupon or other in-kind settlements may be particularly

appropriate in situations "where they provide real benefits to consumer class members."

*In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 n.4 (9th Cir. 2013) (quoting S. Rep.

No 109–14 at 31).

In this case, the injury to the class members consists of the loss of the ability to use a drink voucher.  They will regain exactly that via the settlement.  Thus this case is not like those in which a coupon is substituted for a pecuniary loss.  Finally, the Court notes that a number of the arguments by objectors fail to recognize that a settlement, being a product of compromise, typically offers less than a full recovery.  *See EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).

The Court acknowledges that coupon-based settlements pose problems that are not present in most cash-based settlements.  As the Seventh Circuit has noted, coupon settlements have been criticized because "(1) it is doubtful that they provide meaningful compensation to most class members; (2) they often fail to disgorge ill-gotten gains from the defendant; and (3) they may force class members to do future business with the defendant."  *Synfuel Techs.*, 463 F.3d at 653 (internal quotation marks omitted) (citing Christopher R. Leslie, "The Need To Study Coupon Settlements in Class Action Litigation," 18 Geo. J. Legal Ethics 1395, 1396-97 (2005)).  The Court has considered these issues carefully in assessing the proposed settlement.  But as noted earlier, this settlement differs from many coupon-based settlements in the sense that the underlying loss itself involved a voucher; the settlement does not substitute a coupon for a pecuniary loss.  In addition, because the settlement involves a return of a drink voucher virtually indistinguishable from the one that the class members lost, it fully disgorges any ill-gotten gains.  And finally, the problem of forcing class members to do future business with the defendant has far less force in this case than in others.  The class members consist of persons who held drink vouchers but had not yet used them.  To

17

use those vouchers, they would have had to fly again on Southwest. Thus the proposed settlement does not require any further business relationship between the plaintiffs and the defendant other than what they otherwise would have had to engage in to be able to receive the benefit of their drink vouchers. The Court concludes that the settlement is fair, reasonable, and adequate even though it involves in-kind compensation.

### b. Requirement of claim form

A number of objectors contend that the settlement is unreasonable because it requires them to submit a claim in order to receive settlement benefits. "[T]here is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593 (N.D. Ill. 2011). *See also Milliron v. T-Mobile*, No. 08-4149 (JLL), 2009 WL 3345762, at *6 (D.N.J. 2009) ("[T]he Court finds it perfectly appropriate to require Class members to submit certain information proving that they are entitled to collect the relief awarded in this case."). Further, a claim form is reasonable and appropriate, because although Southwest tracked the number of vouchers issued, it did not track how many were redeemed. In addition, class members can make a claim online at little or no expense and can either submit or simply affirm the number of unredeemed vouchers they had. Thus the claims process imposes only a minimal burden that does not detract from the otherwise reasonable terms of the settlement.

### c. General objections to class actions

A final group of objectors express general disapproval of the case and with class action lawsuits in general. The Court agrees fully with the comments of its colleague

Judge Amy St. Eve in rejecting a similar argument:

> [T]he law recognizes class actions as a legitimate part of the U.S. litigation system.  The Supreme Court has made this clear on several occasions. *See, e.g., General Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982) (explaining that, in appropriate cases, "the class action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23"); *Deposit Guaranty Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.").  In addition, Federal Rule of Civil Procedure 23 provides for the use of such a procedure.

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 982 (N.D. Ill. 2011).  *See also, e.g., Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."), *quoted in Amchem Prods.*, 521 U.S. at 617.

The Court respects the opinions of those objecting class members who do not think that this lawsuit should have been filed, are opposed to class actions generally, or who take a dim view of lawyers who file class actions.  Some of the adverse comments, however, suggest that the existence of the lawsuit, and its settlement, somehow demean the courts and our legal system.  The Court respectfully disagrees.  It is worth keeping in mind the events that gave rise to this lawsuit.  Business Select travelers paid more for their tickets in return for certain enhancements, one of which was the drink vouchers.  Plaintiffs' complaint quotes Southwest's chief executive officer as saying that

the airline had decided to stop honoring the vouchers because there were too many

outstanding and this had the potential to affect the airline's bottom line.  In short,

plaintiffs alleged that Southwest openly reneged on its contracts with its Business Select

travelers because it had decided, after the fact, that it had made a bad deal.  Thus the

lawsuit seeks to enforce a bedrock principle underlying our economic system, namely

that parties to a contract should live up to their promises.  The Court respectfully

suggests that a lawsuit that calls upon a contracting party to honor its contractual

promise – a pillar of the rule of law in a market economy like ours – does not deserve

the scorn that some of the objectors have heaped upon it.

### 7.     Conclusion

After consideration of the relevant factors, the Court finds that the proposed the

settlement is fair, reasonable, and adequate.  The Court therefore grants the parties'

joint motion for final approval of the settlement.

### C.     Proposed incentive awards

Plaintiff also ask the Court to approve incentive awards of $15,000 for each of

the two named plaintiffs.  "Incentive awards are justified when necessary to induce

individuals to become named representatives."  *In re Synthroid Mktg. Litig.*, 264 F.3d

712, 722 (7th Cir. 2001).  This is unquestionably such a case.  The value of an

individual Business Select drink voucher is minimal.  No individual plaintiff would have

lost enough on his or her own to justify filing suit, absent some additional incentive.

In deciding whether an incentive award is proper, and if so, in what amount,

"relevant factors include the actions the plaintiff has taken to protect the interests of the

class, the degree to which the class has benefitted from those actions, and the amount

of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

The record reflects that Levitt and Malone have been active participants in the litigation, expending significant amounts of their time to benefit the class. Class counsel report, and it is uncontradicted, that Levitt and Malone have been involved in this case since its inception. Both assisted with written discovery, both of them prepared for and sat for depositions, and both consulted with class counsel on a regular basis. Levitt also participated in one of the mediation sessions with Judge Andersen. The class benefitted from their efforts; there is a solid basis to believe that discovery improved the prospects for a favorable settlement.

Awards of $15,000 for each plaintiff are well within the ranges that are typically awarded in comparable cases. *See, e.g.*, *Cook*, 142 F.3d at 1015 (affirming $25,000 incentive award where named plaintiff reasonably feared workplace retaliation); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 430 (2d Cir. 2007) (approving incentive awards of $25,000 to named plaintiffs whose depositions were taken); *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 768 (S.D.W.Va. 2009) (awarding $15,000 even though class counsel provided no evidence that any of the class representatives had their depositions taken); *In re M.L. Stern Overtime Litig.*, No. 07cv118 BTM (JMA), 2009 WL 3272872 (S.D. Cal. 2009) (approving $15,000 incentive award). The Court has, earlier in this decision, considered and rejected objector Markow's contention that there is too great a disparity between the proposed incentive awards and the benefits the settlement provides to class members.

Having considered the relevant factors, the Court finds that the requested

incentive awards of $15,000 are reasonable.

## Conclusion

For the foregoing reasons, the Court grants final approval of the settlement

[docket no. 88] and the incentive award portion of the motion for attorney's fees, costs,

and incentive awards [docket no. 103].

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 26, 2013

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: SOUTHWEST AIRLINES | ) | Case No. 11 C 8176 |
| VOUCHER LITIGATION | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

The Court previously approved a class-wide settlement in this action.  *See In re*

*Southwest Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 4510197 (N.D. Ill. Aug. 26,

2013).  This decision concerns plaintiffs' petition for an award of attorney's fees and

costs.  Familiarity with the settlement approval decision is assumed.

**Background**

The plaintiffs, Adam Levitt and Herbert Malone, sued Southwest Airlines Co. on

behalf of a class of similarly situated Southwest customers.  Their lawsuit concerned

drink vouchers that Southwest had provided to travelers who purchased premium-priced

"Business Select" tickets.  Each voucher was good for a single alcoholic drink that

would cost $5 if paid for in cash.  The vouchers did not have an expiration date.  On

August 1, 2010, Southwest stopped honoring the vouchers.  In their complaint, plaintiffs

quoted Southwest's chief executive officer as saying that the airline had decided to stop

honoring the vouchers because there were too many outstanding and this had the

potential to affect the airline's bottom line.  In other words, plaintiffs essentially alleged

that Southwest had reneged on its contracts with its Business Select customers

because it had decided, after the fact, that it had made a bad deal.

Plaintiffs filed this suit in federal court pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2).  They alleged in their complaint that Southwest committed a breach of contract, was unjustly enriched, and violated various state consumer protection laws.  In March 2012, the Court granted Southwest's motion to dismiss as to three of plaintiffs' four claims.  This left standing only plaintiffs' breach of contract claim.

The parties then engaged in discovery.  Both sides served and responded to interrogatories and requests for production of documents.  Southwest took the depositions of Levitt and Malone, and plaintiffs' counsel took the depositions of various Southwest employees.

The parties then entered into settlement negotiations.  They engaged in a two-day mediation session with retired Judge Wayne Andersen and reached an agreement to settle the claims of the plaintiff class.  As indicated earlier, the Court recently approved the settlement.  It defines the settlement class as including all Southwest customers who purchased a drink voucher through the purchase of a Business Select ticket before August 1, 2010 but did not redeem the voucher.  The settlement allows each class member to submit a proof of claim form and supporting documentation in order to receive one replacement drink voucher for each unredeemed drink voucher. Each replacement voucher expires one year after its date of issuance.

In addition to compensating class members directly, the settlement includes provisions that amount to injunctive relief against Southwest.  Specifically, the settlement includes the following requirements.  First, if Southwest issues any drink vouchers following the settlement that do not include an expiration date, it must honor

2

those vouchers on any Southwest flight at any time. This would essentially prevent Southwest from repeating what it is alleged to have done with the vouchers at issue in this case. Second, Southwest must honor the expiration dates printed on post-settlement drink vouchers and may not retroactively invalidate them. Third, if Southwest issues drink vouchers and limits their use to the date of the flight for which the ticket was issued, it must include conspicuous language on the vouchers stating this.

Finally, the settlement of the class members' claims includes payment by Southwest of $15,000 incentive awards to the two named plaintiffs, Levitt and Malone.

After negotiating the proposed settlement of the class members' claims, plaintiffs and Southwest separately negotiated regarding attorney's fees for class counsel, again with the assistance of retired Judge Andersen. It is undisputed that there was no negotiation regarding attorney's fees until after the parties had reached agreement on settlement of the class members' claims. By the time of the Court's preliminary approval of the settlement, plaintiffs and Southwest had reached an agreement that, subject to court approval, Southwest would pay class counsel fees of no less than $1,750,000 and no more than $7,000,000 and would reimburse counsel's costs and expenses up to $30,000. The notice of the proposed settlement that was sent to class members referenced this agreement.

Following the Court's preliminary approval of the settlement, the parties continued their negotiations regarding attorney's fees, again with the assistance of Judge Andersen. Southwest ultimately agreed not to oppose a fee request of up to $3,000,000 plus out of pocket expenses of up to $30,000. Plaintiffs' counsel have now petitioned for an award of fees and expenses in those amounts.

3

A25

**Discussion**

Plaintiffs' counsel justify their requested fee award by its relationship to the overall value of the settlement. They say that each replacement voucher is worth five dollars, the price of a premium or alcoholic beverage on a Southwest flight for a passenger who does not have a voucher. Analysis conducted by Southwest suggests that no more than half of the vouchers that it originally distributed were redeemed. Using this fifty percent figure, at least 5,800,000 vouchers were not redeemed. This would make the face value of the replacement vouchers at least $29,000,000.

Plaintiffs' counsel cite the Seventh Circuit's endorsement of the percentage-of-recovery method as the best way to calculate attorney's fees in a class action. *See Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund, in recognition of the fact that most suits for damages in this country are handled on the plaintiff's side on a contingent-fee basis.") (citations omitted). Valued this way, the proposed fee award would be just a little over ten percent of the claimed value of the settlement. This, plaintiffs argue, is well below the benchmark of twenty-five percent suggested in the *Gaskill* decision for settlements that involve multimillion dollar amounts. *See id.*

Plaintiffs' counsel also argue that the proposed award is appropriate if one uses the so-called "lodestar" method of multiplying a reasonable hourly rate for the lawyers' services by the number of hours reasonably expended, *see, e.g., Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010), and then applying a multiplier. Plaintiffs' lead counsel Joseph Siprut has submitted an affidavit that provides the following breakdown

A26

of time and proposed hourly rates:

- <u>Joseph Siprut</u>: 928 hours at $585 per hour

- <u>James McClintick</u>: 551.9 hours at $325 per hour

- <u>Aleksandra Vold</u>: 1005.7 hours at $325 per hour

- <u>Gregg Barbakoff</u>: 388.4 hours at $225 per hour

- <u>Kristina Pearson</u>: 25.2 hours at $150 per hour

These figures total 2,899.2 hours. This includes 222 hours that Siprut estimated would be spent after submission of the fee petition to prosecute the case to its conclusion.

Based on these figures, the base lodestar figure, calculated as proposed by plaintiffs' counsel, is $1,140,270. A risk multiplier of 2.63, plaintiffs' counsel argue, would result in the requested $3 million award. They contend that this would be within the range of risk multipliers approved in this circuit. *See Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 (7th Cir. 1991) ("Multipliers anywhere between one and four have been approved.") (citation omitted).

A number of those who have objected to the settlement contend that the requested attorney's fee award is disproportionate to the value of the benefits the settlement provides to class members. None of them address the attorneys' hours or proposed hourly rates in detail.

Certain objectors contend that that the drink vouchers offered in the proposed settlement amount to "coupons." As a result, they contend, any award of attorney's fees is subject to CAFA's provisions applicable to class action settlements that "provide for a recovery of coupons." *See* 28 U.S.C. § 1712(a)-(c).

**1.    Whether CAFA's "coupon" provisions apply**

The first question is whether the proposed settlement "provide[s] for a recovery of coupons" within the meaning of CAFA.  "While CAFA does not expressly define what a coupon is, the legislative history suggests that a coupon is a discount on another product or service offered by the defendant in the lawsuit."  *Fleury v. Richemont North America, Inc.*, No. C-05-4525, 2008 WL 3287154, at *2 (N.D. Cal. Aug. 6, 2008). Courts have also indicated that a key characteristic of a coupon is that it "force[s] future business with the defendant."  *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2005); *see also Yeagley v. Wells Fargo & Co.*, No. C-05-3403, 2008 WL 171083, at *8 (N.D. Cal. Jan. 18, 2008) (noting that the settlement benefit of a free credit report "is unlike a coupon in that it does not require a class member to do business with [defendant] and entitles the class member to a whole product . . . rather than merely a discount.").

The proposed settlement provides class members with a drink voucher redeemable for a free alcoholic drink on any Southwest flight, as a replacement for any unredeemed voucher.  To redeem a replacement voucher, a class member will be required to fly on a Southwest flight.  In some situations, class members may have existing reservations for flights on which they can redeem the replacement vouchers.  It is likely, however, that in many or most situations, a class member will have to purchase a new ticket in order to use a replacement voucher.  Either way, use of the replacement voucher provided by the settlement requires the recipient to do business with Southwest again.[1]  For these reasons, the Court concludes that the replacement vouchers are

---

[1] In its decision approving the proposed settlement, the Court said that this factor did not counsel against approval of the settlement of the claims of the class, because holders of the

"coupons" within the meaning of CAFA.

The Court acknowledges, as it noted in addressing the question of settlement approval, that this settlement differs from most other coupon-based settlements. Here the class members are getting back exactly what they had before, an unexpired drink voucher. Thus the settlement, unlike most coupon-type settlements, does not involve substituting a coupon for some other pecuniary loss. CAFA, however, does not distinguish between settlements in which a coupon is provided to compensate for a lost coupon and those in which a coupon is provided to compensate for some other loss. Rather, the statute treats all settlements involving coupons in the same way. Given the plain language of the statute, the Court concludes that the replacement voucher aspect of the settlement involves "a recovery of coupons" within the meaning of CAFA. Thus CAFA's attorney's fee provisions relating to coupon settlements apply.

## 2.    Application of CAFA, 28 U.S.C. § 1712

As indicated earlier, certain objectors argue that because the settlement is a coupon settlement, CAFA, specifically, 28 U.S.C. § 1712(a), requires any attorney's fee award to be based on the value of the coupons redeemed. These objectors therefore contend that an attorney's fee award at this point is premature and that any award of fees must await the conclusion of the period for redeeming the replacement drink vouchers.

The Court agrees with the objectors that CAFA's attorney's fee provisions preclude an attorney's fee award based on the value of the unredeemed replacement

---

original vouchers who had not used them would have been required to fly again to redeem them. In other words, they are no worse off than they would have been had Southwest continued to honor the original vouchers. This, however, does not alter the essential character of the replacement vouchers as coupons.

coupons.  The Court also concludes, however, that contrary to the objectors'

contentions, CAFA permits the use of the lodestar method to determine class counsel's

fees.

Section 1712 states, in pertinent part:

**(a) Contingent fees in coupon settlements**.— If a proposed settlement
in a class action provides for a recovery of coupons to a class member,
the portion of any attorney's fee award to class counsel that is attributable
to the award of the coupons shall be based on the value to class members
of the coupons that are redeemed.

**(b) Other attorney's fee awards in coupon settlements**.—

**(1) In general**.— If a proposed settlement in a class action provides
for a recovery of coupons to class members, and a portion of the
recovery of the coupons is not used to determine the attorney's fee
to be paid to class counsel, any attorney's fee award shall be based
upon the amount of time class counsel reasonably expended
working on the action.

**(2) Court approval**.— Any attorney's fee under this subsection
shall be subject to approval by the court and shall include an
appropriate attorney's fee, if any, for obtaining equitable relief,
including an injunction, if applicable.  Nothing in this subsection
shall be construed to prohibit application of a lodestar with multiplier
method of determining attorney's fees.

**(c) Attorney's fee awards calculated on a mixed basis in coupon
settlements**.— If a proposed settlement in a class action provides for an
award of coupons to class members and also provides equitable relief,
including injunctive relief—

**(1)** that portion of the attorney's fee to be paid to class counsel that
is based upon a portion of recovery of the coupons shall be
calculated in accordance with subsection (a); and

**(2)** that portion of the attorney's fee to be paid to class counsel that
is not based upon a portion of the recovery of coupons shall be
calculated in accordance with subsection (b).

*Id*. § 1712(a)-(c).

Section 1712 is constructed in a somewhat unwieldy way.  This is likely the

result, at least in part, of the fact that (as the Ninth Circuit has noted) CAFA "'resulted from years of intense lobbying . . . partisan wrangling, and, following two successful filibusters, fragile compromises.'"  *In re: HP Inkjet Printer Litig.*, 716 F.3d 1173, 1181 (9th Cir. 2013) (quoting Stephen B. Burbank, "The Class Action Fairness Act of 2005 in Historical Context:  A Preliminary View," 156 U. Pa. L. Rev. 1439, 1441 (2008)).

Unwieldiness aside, subsection 1712(a) makes it clear that it is inappropriate to base a fee award in a coupon settlement case on the *un*redeemed value of the coupons.  It says that if the settlement, as in this case, provides for a recovery of coupons, the portion of any fee award attributable to the coupon award "shall be based on the value to class members of the coupons that are redeemed."

By its literal terms, however, subsection 1712(b) authorizes a lodestar-based fee award in a case like this one.  That provision contains three clauses.  The first makes it clear that subsection 1712(b) applies here:  the class settlement in this case "provides for a recovery of coupons to class members."  The second clause permits a fee award to be based on something other than the value of the coupons:  "a portion of the recovery of the coupons is not used to determine the attorney's fee."  The third clause authorizes use of the lodestar method:  when clauses one and two apply, the fee award "shall be based upon the amount of time class counsel reasonably expended working on the action."

The thrust of the objectors' position, however, is that *any* fee award in this case is "attributable to the award of coupons" within the meaning of subsection 1712(a).  The objectors therefore argue that under that subsection, the only appropriate basis for a fee award is the value of those coupons that actually end up getting redeemed by class

members.

This was the position adopted by the panel majority in *In re HP Inkjet Printer Litigation.* The majority in that case concluded that whenever a class settlement involves only coupons, "the fees award cannot be 'attributable to' anything but the coupons." *In re HP Inkjet Printer Litig.*, 716 F.3d at 1182. The majority said that although one could argue that a fee award in such a case is "attributable to the work of class counsel," that argument would be mistaken:

> Attorney's fees are *never* "attributable to" an attorney's work on the action. They are "attributable to" the relief obtained for the class. An attorney who works incredibly hard, but obtains nothing for the class, is not entitled to fees calculated by any method. For although class counsel's hard work on an action is presumably a necessary condition to obtaining attorney's fees, it is never a sufficient condition. Plaintiffs['] attorneys don't get paid simply for working; they get paid for obtaining results. Because it is the class relief that is *both* a necessary and a sufficient condition to an award of attorney's fees, it follows that an attorney's fees award can only be "attributable to," or the consequence of, class relief, not the attorney's hard work.

*Id.* (citation omitted).

This Court respectfully disagrees. The Court believes that in this passage, the Ninth Circuit majority conflated two distinct issues – entitlement to fees, and the amount of a fee award. Entitlement to fees is dependent on, and thus attributable to, the lawyer's success – whether the attorney won or lost. But although the amount of the award may be affected by the degree of the attorney's success, in the ordinary case it cannot be said to be "attributable to" the attorney's success. Rather, success is one factor – but only one – in determining the amount of a fee award. In the usual "lodestar" case, the amount of the award is, in fact, attributable to the attorney's work. As the Supreme Court indicated in its seminal decision on fee awards, *Hensley v. Eckerhart*,

461 U.S. 424 (1983), success is a condition precedent to recovery of a fee, but the amount of the fee is not attributable to success or even the degree of success. Rather, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," *id.* at 433 – in other words, the work counsel did. The figure that results from this calculation may be adjusted based on a number of factors, including the degree of success. *Id.* at 434. But that does not mean that the fee award is "attributable" to the attorney's success. Rather, it is attributable to the work the attorney performed and the value reasonably ascribed to that work. And even in a case in which the fee is based on a percentage of the recovery, the amount of the fee award is not "attributable to" the attorney's success; rather, it is attributable to the amount of the recovery and the appropriate contingency percentage. In short, this Court respectfully suggests that the Ninth Circuit majority's reading of subsection 1712(a) is based on an incorrect interpretation of that provision's use of the term "attributable to."

The Ninth Circuit majority further determined that subsection 1712(b) applies only when a class settlement involves "mixed" relief – both coupons and non-coupon relief. *Id.* at 1183. It concluded that "a district court may award lodestar fees under subsection (b)(1) but only where the settlement is based 'in part' on coupon relief." *Id.* at 1184. The majority appears to have concluded that under subsection 1712(b), a court may award a lodestar-type fee only on the non-coupon part of a mixed settlement but must base a fee on the coupon part of such a settlement exclusively on the redeemed value of the coupons. *Id.* at 1183.

As the Court has indicated, it does not agree with this limitation on subsection

11

A33

1712(b).  The Court believes that the Ninth Circuit majority read that provision contrary

to its plain language.  The "attributable to" language used in subsection 1712(a) does

not appear in 1712(b).  Rather, the statute says, in a straightforward way, that if a

portion (percentage) of the coupon recovery is not used to determine the attorney's fee,

the lodestar method shall be used.  The Court does not see how this can appropriately

be read as *precluding* a lodestar-type award in a coupon settlement case.

  To the extent there is an ambiguity in section 1712, it is resolved by the overall

structure of the statute and the various subsections' titles.  *See Fla. Dep't of Revenue v.*

*Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("[S]tatutory titles and section

headings are tools available for the resolution of a doubt about the meaning of a

statute.") (internal quotation marks omitted).  The three subsections are entitled,

respectively, "Contingent fees in coupon settlements," "Other attorney's fee awards in

coupon settlements," and "Attorney's fee awards calculated on a mixed basis in coupon

settlements."   These titles indicate that the three provisions are constructed as parallel

methodologies that are available as alternatives when a class settlement involves

recovery of coupons.  If the plaintiff proposes a fee award based on a percentage of the

value of the coupons, the award, under subsection 1712(a), may be based only on the

value of the coupons actually redeemed.  The term "contingent fee" in the heading of

subsection 1712(a) supports this interpretation, as such fees are generally calculated as

a *percentage* of the clients' recovery.  In short, subsection 1712(a)'s purpose and effect

is to preclude basing an attorney's fees on a percentage of the face (i.e. unredeemed)

value of coupons.

  But the plaintiff is not limited to a coupon-value-based fee award; under

subsection 1712(b), the plaintiff may seek a lodestar-based fee.  As with subsection

1712(a), the heading of subsection 1712(b) also refers without limitation to fees

awarded "*in* coupon settlements."  Comparison of the two titles thus supports a reading

of the two subsections as alternative methodologies for determining fee awards in

coupon settlement cases.  Further, subsection (b)(1) includes the exact same language

used in the introduction of subsection 1712(a):  "If a proposed settlement in a class

action provides for a recovery of coupons to class members . . . ."  The use of this

parallel phrasing further indicates that subsections (a) and (b) describe alternative

methodologies.

Finally, under subsection 1712(c), in cases involving both coupon and equitable

relief, both methods of fee calculation may, but need not, be used.  This is made clear

by the language in each subparagraph that refers to "*that portion of the attorney's fee*"

calculated as either "based upon a portion of the recovery" or "not based upon a portion

of the recovery."  *Id.* § 1712(c)(1)-(2) (emphasis added).  The statute thus creates the

option of calculating an attorney's fee award in a mixed relief case via the lodestar

method, as a purely contingent fee, or as a combination of the two.  In short, mixed

relief does not compel mixed calculation.

CAFA's legislative history confirms the Court's reading of the attorney's fee

provisions.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 567 (2005)

(noting that where a statute is ambiguous, a court "should look to other interpretive

tools" including legislative history).  The 2005 Senate Report states, in relevant part:

> . . . Section 1712(a) states that in class action settlements in which it is
> *proposed* that an attorney fee award be based solely on the purported
> value of the coupons awarded to class members, the fee award should be
> based on the demonstrated value of coupons actually redeemed by the

class members. . . .

> In some cases, the *proponents of a class settlement* involving coupons *may decline to propose* that attorney's fees be based on the value of the coupon-based relief provided by the settlement.  Instead, the *settlement proponents may propose that class counsel fees be based upon the amount of time class counsel reasonably expended* working on the action.  *Section 1712(b) confirms the appropriateness of determining attorneys' fees on this basis* in connection with a settlement based in part on coupon relief.  As is stated on its face, nothing in this section should be construed to prohibit using the "lodestar with multiplier" method of calculating attorney's fees. .

S. Rep. No. 109-14 at 30 (2005) (emphasis added).  Thus by highlighting the settlement proponents' choice in proposing what to base fees upon, the report makes clear that subsection 1712(a) governs only *how* attorney's fees based on the percentage of recovery must be calculated, not *whether* a percentage of recovery method must be used.

Judge Berzon, the dissenting judge in *In re HP Inkjet Printer Litigation*, read section 1712 the same way as this Court does.  Specifically, Judge Berzon concluded that

> CAFA allows the use of a lodestar to calculate attorney's fees on the basis of hours reasonably expended on the class action as a whole, rather than as a percentage of the value of the class recovery.  That permission applies whether the relief obtained for the class involves, in whole or in part, coupons, or whether it does not.  The limit CAFA imposes with regard to cases in which there is coupon recovery is a limit on the district court's method of calculating percentage-of-recovery fees, should it choose that approach.  [Section] 1712(a) regulates *how* a percentage-of-recovery fee should be calculated, if that method is used to award attorney's fees for a coupon settlement; it does not dictate *whether* a percentage-of-recovery method must be used.  Subsections 1712(b) and (c), in turn, provide that a lodestar method may be used either as an alternative to, or in combination with, a percentage-of-recovery calculation.

*In re HP Inkjet Printer Litig.*, 716 F.3d at 1187-88 (Berzon, J., dissenting).  This Court agrees.

The Court adds that its reading of section 1712 is consistent with Congress's evident purpose of preventing excessive fee awards based on the largely illusory value of unredeemed coupons. As Judge Berzon put it in her dissent in *In re HP Inkjet Printer Litigation*, the reading of the statute that this Court adopts "makes perfect sense in the context of the concerns that motivated § 1712 – namely, the potential for huge fees through a percentage approach, where the percentage was of all coupons that *could* be redeemed, even though few were." *Id.* at 1196 (Berzon, J., dissenting) (citing S. Rep. No. 109-14, at 30). The Court notes that under the lodestar method, the degree of success is an appropriate consideration in determining whether and how to adjust the lodestar figure. *See Hensley*, 461 U.S. at 434. In a case like this one, the actual value to class members of the coupons provided via settlement remains an important consideration in a fee award under subsection 1712(b), even though that value is determinative of the fee award as objectors urge.

With the exception of *In re HP Inkjet Printer Litigation*, courts addressing CAFA's attorney's fees provisions have, like this Court, found that the statute allows for the calculation of fees in a coupon settlement using the lodestar-multiplier method. *See, e.g., Blessing v. Sirius XM Radio*, 507 Fed. Appx. 1, 4 (2d Cir. 2012) ("Even assuming that the coupon provisions of CAFA were applicable, the district court's approval of the proposed settlement and the attorneys' fee award was appropriate. . . . The district court approved the fee award after determining it was reasonable under the lodestar method . . . and is therefore consistent with CAFA."); *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 77-78 (D.D.C. 2011) ("The statute explicitly contemplates application of the lodestar method with a multiplier, but it does not explicitly require that approach.");

15

A37

*Perez v. Asurion Corp.*, No. 06-20734, 2007 WL 2591180, at *2 (S.D. Fla. Aug. 8, 2007) ("CAFA gives the Court the discretion to award fees using the lodestar method.").

For these reasons, the Court rejects plaintiffs' contention that it may make a fee award based on a percentage of the overall value of the coupons provided via the settlement, but agrees with plaintiffs' contention that it may use the lodestar method to determine an appropriate fee.

### 3.    Application of the lodestar method

Under the lodestar method, the Court begins by multiplying the number of hours that class counsel reasonably worked by a reasonable hourly rate. *See, e.g., Gastineau*, 592 F.3d at 748. The fee petitioner carries the burden of persuasion on these issues. *See Hensley*, 461 U.S. at 437 ("the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates").

No party or objector has offered any challenge to the reasonableness of any of the time claimed by counsel. On the face of the fee petition, the hours claimed do not appear to be excessive. The Court has no point of reference from which it can fairly challenge counsel's claim that the time they spent on the case was reasonable.

No party or objector has made an objection to these proposed hourly rates. Here, however, the Court has other readily available data that it may use as a check on the rates sought by plaintiffs' counsel.

The Court begins its discussion of hourly rates with the applicable standards. A reasonable hourly rate is "one that is derived from the market rate for the services rendered." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011)

16

(internal quotation marks omitted).  The focus is "the prevailing market rate for lawyers

engaged in the type of litigation in which the fee is being sought."  *Cooper v. Casey*, 97

F.3d 914, 920 (7th Cir. 1996) (emphasis omitted).  *See also Spegon v. Catholic Bishop*

*of Chicago*, 175 F.3d 544, 555 (7th Cir. 1999).  If the attorney has an actual billing rate

that he or she typically charges and obtains for similar litigation, that is presumptively

his hourly rate.  *Pickett*, 664 F.3d at 640.  In some situations, however, the attorney

does not have an established market rate, for example, because he or she typically

uses contingent fee arrangements or relies on statutory fee awards.  That is the case

here.  In such a case, a court should rely on the "next best evidence" of the attorney's

market rate, namely "evidence of rates similarly experienced attorneys in the community

charge paying clients for similar work and evidence of fee awards the attorney has

received in similar cases."  *Id.* (internal quotation marks omitted).

      As indicated earlier, plaintiffs seek hourly rates of $585 per hour for Joseph

Siprut; $325 per hour for James McClintick and Aleksandra Vold; $225 per hour for

Gregg Barbakoff; and $150 per hour for paralegal Kristina Pearson.  *See* Siprut Affid. ¶¶

13 & 15-18.  Siprut's affidavit does not describe his level of experience, thus leaving it to

the Court to do its own research.  Siprut's LinkedIn profile – at least the publicly

available version, the only version to which the Court has access – indicates that he is a

2003 graduate of Northwestern Law School.  *See* http://www.linkedin.com/in/jsiprut (last

viewed Sept. 26, 2013).  This would mean that during the period when this lawsuit was

prosecuted, Siprut had been an attorney for eight to ten years.  The same profile

indicates that Siprut has had his own law firm since 2011, and his biography on his law

firm's web site indicates that prior to that time, he practiced law at "corporate litigation

firms." *See* http://www.siprut.com/attorneybiographies_js.html (last viewed Sept. 26, 2013). Siprut's affidavit describes McClintick as "an attorney with seven years of experience," Vold as "a third-year attorney," Barbakoff as "a second-year attorney," and Pearson as a "third-year legal assistant." Siprut Aff. ¶¶ 15-18.

The support offered by plaintiffs' counsel for the hourly rates they seek is rather scanty, to say the least. Lead attorney Joseph Siprut states in his affidavit that he and the other attorneys for plaintiffs "bill" at the rates requested. *See* Siprut Aff. (dkt. no. 103-1) ¶¶ 13 & 15-18. He offers nothing to indicate, however, that the attorneys have charged and obtained these rates for similar litigation, or indeed for any litigation. The only other support that Siprut offers is an excerpt from the results of relatively recent surveys of large law firm billing rates, published by the National Law Journal and the Wall Street Journal. Plaintiffs offer no support, however, for the proposition that these rates involve similar work done in similar cases. In fact, the contrary is likely true. That aside, it would be difficult to reach a reasonable conclusion that the hourly rate charged by a 1,000-lawyer firm representing primarily large corporate clients who voluntarily choose to pay its rates is a fair point of comparison for the reasonable hourly rates for attorneys at a seven-lawyer firm that handles primarily class action and other consumer-related litigation on a contingent-fee basis.

Given the absence of support for the hourly rates plaintiffs request, the Court has consulted published fee awards in other cases. *See, e.g., Schlacher v. Law Ofcs. of Phillip J. Roche & Assocs., P.C.*, 574 F.3d 852, 858 (7th Cir. 2009) (citing *Mathur v. Bd. of Trs. of S. Ill. Univ.*, 317 F.3d at 738, 743 (7th Cir. 2003) (if attorney does not provide evidence of her billing rate for comparable work, district court may look to evidence of

what other attorneys in the community charge for that work); *see generally Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 409 (7th Cir. 1999) (when plaintiff does not meet its burden of proving counsel's market rate, district court is entitled to make its own determination of reasonable hourly rate).

In particular, the Court has reviewed fee awards approved for the law firm of Edelman, Combs, Latturner & Goodwin, a Chicago law firm that has a long-established practice in the same field as Siprut, PC, the firm representing the plaintiff class in this case.  Here are some examples.  In *Jablonski v. Riverwalk Holdings, Ltd.*, No. 11 C 840, 2012 WL 3043687, at *1 (N.D. Ill. July 12, 2012), Judge Blanche Manning approved rates of $400 per hour for work done in 2011 by attorneys Daniel Edelman, Catherine Combs, and James Latturner, who had, respectively, thirty-six, thirty-six, and fifty years of practice experience.  *Id.* at *1.  In 2009, in the case of *In re Trans Union Corp. Privacy Litig.*, No. 00 C 4729, 2009 WL 4799954, at *20 (N.D. Ill. Dec. 9, 2009), Judge Robert Gettleman appears to have okayed a $550 rate for attorney Edelman. That same year, in *Jones v. Ameriquest Mortg. Co.*, No. 05 C 432, 2009 WL 631617, at *4 (N.D. Ill. Mar. 10, 2009), Judge David Coar approved rates of $465 per hour for partners Latturner, Combs, and Tara Goodwin, and a rate of $250 per hour for an associate who was six or seven years out of law school during the relevant period.  In 2008, Judge Sam Der-Yeghiayan approved rates of $450 per hour for partners at the Edelman firm and $210 per hour for the same associate.  *See Hamm v. Ameriquest Mortg. Co.*, 549 F. Supp. 2d 1018, 1022 (N.D. Ill. 2008).

Just this week, the Court considered a fee award (a very modest one) in a case brought by the Edelman firm in which it obtained a default judgment.  That firm

submitted a very comprehensive affidavit by its lead partner, Daniel Edelman,

supporting the following hourly rates claimed for each of its partners and associates:

- $550 for partners Edelman (thirty-seven years of experience), Combs

(thirty-seven years), and Latturner (fifty-one years);

- $505 for partner Goodwin (twenty-two years);

- $445 for partners Michelle Teggelaar (sixteen years), Francis Greene

(thirteen years), and Julie Clark (thirteen years);

- $400 for partner Heather Kolbus (eleven years);

- $355 for partner Thomas Soule (ten years);

- $230 to $290 for associates; and

- $100 to $125 for paralegals.

*See Quazi v. Lizetty and Assoc. Grp. LLC*, Case No. 13 C 4512, dkt. no. 19-5 (affid. of

Daniel Edelman).

This Court's own experience in dealing with fee awards (mostly agreed-upon

awards) in consumer cases is generally consistent with a range bracketed on the higher

end by the hourly rates proposed for lawyers from the Edelman firm in the *Quazi* case

and, at the lower end, with the awards approved by Judges Der-Yeghiayan, Coar, and

Gettleman in the cases cited earlier.[2]  The latter are, at this point, several years old,

indicating that they may not actually represent appropriate current rates.  One way or

another, however, this data strongly suggests that the rates proposed by plaintiffs in the

present case significantly exceed the market rate – at least absent further support,

which plaintiffs have not offered.

---

[2] This conclusion, of course, does not preclude Siprut from seeking higher hourly rates in other cases, assuming he provides support for such rates that passes judicial muster.

The Court also notes, in further support, that it recently dealt extensively with the issue of appropriate hourly rates in a civil rights / wrongful conviction case, *Jimenez v. City of Chicago*, Case No. 09 C 8081.  Although there are differences between how civil rights cases and consumer cases are litigated, the rates the Court considered and approved in that case nonetheless provide a point of comparison that is far more relevant than the large-corporate-firm fees that Siprut cites in his affidavit.  In *Jimenez*, the Court approved an hourly rate of $495 for Jon Loevy, who had nineteen years of experience, "an impressive record of success in plaintiff's civil rights litigation," and skills that "put him in the top tier of civil trial attorneys in the Chicago area."  *Jimenez v. City of Chicago*, No. 09 C 8081, 2012 WL 5512266, at *2 (N.D. Ill. Nov. 14, 2012).  In that same case, the Court approved hourly rates of $300 for an attorney with eight years of experience in the field and $275 for two attorneys with seven years of experience; $250 for an attorney with five years of experience, $225 for attorneys with four years of experience; and $175 for an attorney less than a year out of law school.  *Id.* at *3-4.

In sum, the data that plaintiffs have offered and that the Court has reviewed do not support the rates that plaintiffs' attorneys seek.  In particular, there is no basis on the current record to find that Siprut's market rate is the same as or close to the market rates of attorneys at the Edelman firm who have many years more experience than he does.  Based on the data reviewed, the Court finds that the appropriate hourly rate for attorney Siprut, the lead attorney on the case with eight to ten years of experience during the relevant period, is $425 per hour.  The Court further finds that the appropriate rates for attorneys McClintick (seven years), Vold (three years), and Barbakoff (two years) are $275, $225, and $200, respectively.  Finally, the Court approves a rate of

$125 per hour for paralegal Pearson.

Based on these findings, the lodestar amount totals $888,137.50, calculated as follows:

- <u>Siprut</u>:  $394,400 (928 hours at $425 per hour)

- <u>McClintick</u>: $151,772.50 (551.9 hours at $275 per hour)

- <u>Vold</u>:  $251,425 (1005.7 hours at $250 per hour)

- <u>Barbakoff</u>:  $87,390 (388.4 hours at $225 per hour)

- <u>Pearson</u>:  $3,150 (25.2 hours at $125 per hour)

A court can adjust the lodestar based on, among other things, twelve factors described in *Hensley*.  *Id.* at 434 n. 9. The twelve factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 430 n. 3.  "However, 'many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate.'"  *Anderson v. AB Painting and Sandblasting Inc.*, 578 F.3d 542, 544 (7th Cir.2009) (quoting *Hensley*, 461 U.S. at 434 n. 9).  In the Court's view, the key factors arguably  not subsumed in the lodestar calculation in the present case are "the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation," *Gastineau*, 592 F.3d at 748 (internal quotation marks omitted), and the fact that fees were contingent on the outcome of the case.

22

A44

The legal and factual issues involved in the case were not particularly complex.

Following dismissal of all but one of plaintiffs' claims, the only remaining claim was a

breach of contract claim.  This claim was rather straightforward both factually and

legally.  On the other hand, the case advanced, in the Court's view, a significant public

interest.  As the Court described it in its decision approving the proposed settlement,

plaintiffs' suit sought "to enforce a bedrock principle underlying our economic system,

namely that parties to a contract should live up to their promises."  *In re Southwest*

*Airlines Voucher Litig.*, 2013 WL 4510197, at *10.

The degree of success is a matter of dispute between plaintiffs and the objectors.

As the Court has previously concluded, the settlement returned to the class members

almost exactly what they lost, namely drink vouchers.[3]  In this regard, plaintiffs achieved

a significant degree of success.

The actual value of what counsel obtained for the class, however, is

unquestionably far less than the aggregate face value of the replacement vouchers.

First, not all of the class members would have placed a significant value on the original

vouchers when they received them.  As the Court stated in its settlement approval

decision, "some likely considered the vouchers an important component of the

"Business Select" package; some likely viewed it as less important, but still a factor

worth something; and others likely had no intention of ever using the vouchers and

participated in the Business Select program for other reasons."  *Id.* at *5.  Those who

placed little value on the original voucher may have gotten back what they lost, but its

value to them is negligible.  It is unlikely that most of these class members will even go

---

[3] The only real difference is that the vouchers provided in the settlement have a one-year
expiration date.  As the Court has previously discussed, however, this is not a particularly
significant limitation under the circumstances.

to the trouble of submitting a claim.  Second, there is a very good chance that some of those who considered the original voucher valuable but did not get to use it before Southwest stopped honoring the original vouchers will be unable to use the replacement vouchers because they do not fly on Southwest often enough.  Third, the odds are relatively strong that many of the original voucher recipients who placed the highest value on the vouchers had already used them prior to their revocation by Southwest. Thus it is likely that the "average" class member is among those who placed a lesser value on the voucher to begin with.  All of this suggests that it is unlikely that a particularly high percentage of the vouchers actually will be used, or even claimed.

The Court cannot quantify these factors, but it would be difficult to dispute their accuracy.  These factors did not counsel against approving the settlement, for the reasons the Court discussed in its decision on that subject.  But they do affect one's view of the degree of success.  If nothing else, it is relatively clear that the actual value of the settlement to class members does not begin to approach the $29,000,000 that plaintiffs propose.

Plaintiffs' counsel seek a multiplier of 2.63.  This is a rather artificial figure, evidently chosen because, based on the lodestar counsel initially proposed, it would result in the requested $3,000,000 fee award.  The Court concludes, for the reasons described below, that this would be an excessive multiplier under the circumstances.

Plaintiffs' counsel contend that they faced a significant risk of loss when they filed the case, making a risk multiplier appropriate.  The Seventh Circuit has stated that a court "must award a multiplier when attorney's fees are contingent upon the outcome of the case (*i.e.*, there is the possibility that the attorney will not receive any fee)." *Cook v.*

24

*Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998)).  The choice of a particular multiplier is a matter of discretion and requires "'a retroactive calculation of the probability of success as measured at the beginning of the litigation.'"  *Id.* (quoting *Skelton v. General Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988).  The Seventh Circuit has suggested "that a multiplier of 2 may be a sensible ceiling."  *Id.*  The overall standard, however, is still "whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case."  *Connolly v. Nat'l Sch. Bus. Serv., Inc.*, 177 F.3d 593, 597 (7th Cir. 1999) (internal quotation marks omitted).

In the Court's view, counsel did not face all that significant a risk of defeat on the named plaintiffs' claims.  The existence of a contract was a relatively straightforward proposition, and significant evidence of a material breach appears to have been largely a matter of public record.  The two named plaintiffs' claims, however, were not worth all that much and likely would not have warranted prosecution absent the possibility of certification of a class.  And there plaintiffs' counsel did face a real risk, specifically a risk of non-certification, likely based on manageability issues among others.  Had Southwest successfully contested class certification, the case would have ended not with a bang, but a whimper.  Thus counsel's success in obtaining an agreed-upon class settlement overcame a significant risk of defeat for the class as a whole.

When one takes all of these factors into account – relative lack of complexity; a success whose actual value was modest; the vindication of a public interest; and the risk of an effective defeat if class certification were denied – the Court believes that a multiplier significantly less than the figure plaintiffs propose, and less than the suggested ceiling of 2.0, is appropriate.  The Court will award a multiplier of 1.5.  When

25

A47

applied to the lodestar figure of $888,137.50, this yields attorney's fees totaling

$1,332,206.25.

**D.    Costs**

Federal Rule of Civil Procedure 23(h) allows a court approving a class settlement

to "award reasonable . . . nontaxable costs that are authorized by law or by the parties'

agreement."  Fed. R. Civ. P. 23(h).  The settlement agreement in this case provides that

Southwest shall pay class counsel "costs and expenses not to exceed $30,000."  Dkt.

No. 88 at 24.  Counsel have accounted, however, for only $18,522.32.  This figure is

composed of $350 in filing fees; $1,208.20 in computer-assisted research; $566.05 in

postage, messenger, service, and express delivery fees; $3,800.13 in transcript costs,

$3,171.24 for travel and related expenses, $114.20 in printing, photocopying, and

binding; and $9,312.50 in mediation fees.  Though class counsel has not provided

further detail of these expenses, the Court sees no basis to disallow them; they are

reasonable given the scope and complexity of the litigation.  The remainder of class

counsel's requested expenses, however, are entirely unaccounted for; plaintiffs have

not shown that anything above $18,522.32 was actually disbursed.  Thus there is no

basis to award the higher amount requested.  The Court therefore awards class counsel

expenses in the amount of $18,522.32.

### Conclusion

For the reasons stated above, the Court grants plaintiffs' petition for attorney's

fees in part and awards plaintiffs' counsel attorney's fees in the amount of

A48

$1,332,206.25 and expenses in the amount of $18,522.32.

Date:  October 3, 2013

_____
MATTHEW F. KENNELLY
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re Southwest Airlines Voucher Litigation | ) ) ) | No. 11-CV-8176 |

## FINAL JUDGMENT

WHEREAS Plaintiffs, Class Counsel, and Defendant entered into a Settlement Agreement, with exhibits (collectively, the "Settlement Agreement"), dated December 3, 2012, as amended on December 7, 2012, to settle this Action; and

WHEREAS the Court entered a Preliminary Approval Order dated December 12, 2012, preliminarily certifying the putative Class in this Action for settlement purposes under Fed. R. Civ. P. 23(b)(3), ordering notice to all Class Members listed on the List of Potential Class Members (or to their attorneys) as set forth in Settlement Notice Plan, scheduling a Fairness Hearing, and providing Class Members with an opportunity either to exclude themselves from the settlement class or object to the proposed settlement;

WHEREAS the Court held a Fairness Hearing on May 21, 2013, to determine whether to give final approval to the proposed settlement; and

WHEREAS the Court entered a Memorandum Opinion and Order on August 26, 2013, granting final approval to the Settlement Agreement, including certification of the settlement Class;

WHEREAS, the Court entered a Memorandum Opinion and Order on October 3, 2013, granting Plaintiffs' counsel's fee petition in part (the "October 3, 2013") Order.

It is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

1.     **Incorporation of Other Documents.**   This Final Judgment incorporates and makes a part hereof:

(a)     the Settlement Agreement and any amendments thereto (with all capitalized terms herein having the same meaning as that given to them in the Settlement Agreement);

(b)     the exhibits to the Settlement Agreement;

(c)     the Court's Preliminary Approval Order;

(d)     the Motion and Memorandum In Support of Final Approval of Class Certification;

(e)     the exhibits to the Motion and Memorandum In Support of Final Approval of Class Certification; and

(f)     the August 26, 2013 Order and the October 3, 2013 Order.

2.     **Jurisdiction.**   The Court has personal jurisdiction over all Plaintiffs and has subject-matter jurisdiction over this Action.

3.     **Class Notice.**   The Court finds that the individual notice to the List of Potential Class Members, Publication Notice and distribution of the notice in accordance with the Settlement Notice Plan, the terms of the Settlement Agreement, and this Court's Preliminary Approval Order:

(a)     constituted the best practicable notice to Class Members under the circumstances of this action;

(b)     provided Class Members with adequate instructions and a variety of means to obtain information pertaining to their rights and obligations under the settlement

so that a full opportunity has been afforded to Class Members and all other persons wishing to be heard;

(c)    was reasonably calculated, under the circumstances, to apprise Class Members of: (i) the pendency of this class action, (ii) their right to exclude themselves from the Class and the proposed settlement, (iii) their right to object to any aspect of the proposed settlement (including final certification of the settlement class, the fairness, reasonableness or adequacy of the proposed settlement, the adequacy of representation by Plaintiffs and Class Counsel, and/or the award of attorneys' fees), (iv) their right to appear at the Fairness Hearing - either on their own or through counsel hired at their own expense - if they did not exclude themselves from the Class, and (v) the binding effect of the Preliminary Approval Order and Final Judgment in this action, whether favorable or unfavorable, on all persons who do not timely request exclusion from the Class;

(d)    was calculated to reach a large number of Class Members, and the prepared notice documents adequately informed Class Members of the class action, properly described their rights, and clearly conformed to the high standards for modern notice programs;

(e)    focused on the effective communication of information about the class action, were couched in plain and easily understood language, and were written and designed to the highest communication standards;

(f)    afforded sufficient notice and time to Class Members to receive notice and decide whether to request exclusion or to object to the settlement;

(g)     was reasonable and constituted due, adequate, effective, and sufficient notice to all persons entitled to be provided with notice;

(h)     fully satisfied the requirements of the Federal Rules of Civil Procedure, the United States Constitution, including the Due Process Clause, and any other applicable law.

**4.     Claims Process.**  The Court concludes that the Claim Form was well designed with clear and prominent information that is easily understandable to Class Members. Any Class Member who wished to receive Class Relief must have signed and returned a valid and timely Claim Form to the Settlement Administrator in compliance with the Claims Process set forth in the Settlement Agreement and no later than the Claim Form Deadline.  Any Class Member who does not submit a valid and timely Claim Form in compliance with the Claims Process is not entitled to Class Relief, but nonetheless is barred by the Release and provisions of the Settlement Agreement and the Final Judgment.

**5.     Binding Effect.**  The terms of the Settlement Agreement and of this Final Judgment shall be forever binding on Plaintiffs and all other Class Members and any other Releasor, and those terms shall have *res judicata* and other preclusive effect in all pending and future claims, lawsuits or other proceedings maintained by or on behalf of any such persons, to the extent those claims, lawsuits or other proceedings involve matters that were or could have been raised in this Action or are otherwise encompassed by the Release.

**6.     Release and Waiver.**  The Release, which is set forth in the Settlement Agreement in Section IX, is expressly incorporated herein in all respects and is effective as of the date of this Final Judgment. In return for the consideration provided in the Agreement:

A.      Plaintiffs and Releasors release, acquit and forever discharge the Releasees from the Released Claims, including but not limited to any and all past, present, and future causes of action, claims, damages (including but not limited to compensatory damages and punitive damages), or any other damages, awards, equitable, legal and administrative relief, interest, demands or rights that are based upon, related to, or connected with, directly or indirectly, in whole or in part (1) the Released Claims; or (2) the allegations, facts, subjects or issues that were, could have been, may be or could be set forth or raised in the Action.

B.      Southwest and the Releasees, jointly and severally, shall and hereby do fully release and discharge Plaintiffs and Class Counsel from any past, present, and future causes of action, claims, damages (including but not limited to compensatory damages and punitive damages), or any other damages, awards, equitable, legal and administrative relief, interest, demands or rights that are based upon, related to, or connected with, directly or indirectly, in whole or in part (1) the Released Claims; or (2) the allegations, facts, subjects or issues that were, could have been, may be or could be set forth or raised in the Action.

C.      Plaintiffs, on their own behalf and on behalf of all other Releasors shall not now or hereafter initiate, participate in, maintain, or otherwise bring any claim or cause of action, either directly or indirectly, derivatively, on their own behalf, or on behalf of the Class or the general public, or any other person or entity, against the Releasees based on allegations that are based upon or related to, directly or indirectly, in whole or in part:  (1) the Released Claims; (2) the allegations, facts, subjects or issues that have been, could have been, may be or could be set forth or raised in the Action.

D.      Plaintiffs and all other Class Members and all the other Releasors, and anyone acting on their behalf or for their benefit, without limitation, are precluded and estopped

from bringing any claim or cause of action in the future, related to in any way, directly or indirectly, in whole or in part: (1) the Released Claims, or (2) the allegations, facts, subjects or issues that have been, could have been, may be or could be set forth or raised in the Action.

       E.     Plaintiffs and the Class Members, on their behalf and on behalf of all other Releasors, are releasing both known and unknown and suspected and unsuspected claims and causes of action, and are aware that they may hereafter discover legal or equitable claims or remedies or injuries or damages presently unknown, or facts in addition to or different from those which they now know or believe to be true with respect to the allegations and subject matters in the complaint or other filings in the Action. Plaintiffs and the Class Members to fully, finally and forever settle and release all such matters, and all claims and causes of action relating thereto, which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in the Action).

       F.     There are certain principles of law applicable in some states, such as Section 1542 of the Civil Code of the State of California, which provides: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR." All such federal or state laws, rights, rules, or legal principles of any jurisdiction that may be applicable here, are hereby knowingly and voluntarily waived and relinquished by Plaintiffs and the Class Members.

       G.     The Release may be raised as a complete defense to and will preclude any action or proceeding that is encompassed by this Release.

7.    **Permanent Injunction**.  All Class Members who have not been timely excluded from the Class and all Releasors, and anyone acting on their behalf or for their benefit, are hereby permanently barred and enjoined from: (i) filing, commencing, prosecuting, maintaining, intervening in, participating in (as class members or otherwise), or receiving any benefits or other relief from any other lawsuit, arbitration, or administrative, regulatory or other proceeding or order in any jurisdiction based on or relating to the claims and causes of action that have been, may be or could have been set forth or raised in the Action, the Released Claims and/or the acts and circumstances relating thereto; (ii) organizing or soliciting the participation of any Class Members in a separate class for purposes of pursuing as a purported class action (including by seeking to amend a pending complaint to include class allegations, or by seeking class certification in a pending action) any lawsuit or other proceeding based on or relating to the claims and causes of action that have been, may be or could have been set forth or raised in the Action, the Released Claims and/or the acts and circumstances relating thereto; or (iii) filing or commencing any action on behalf of the general public based on or relating to the claims and causes of action that have been, may be or could have been set forth or raised in the Action, the Released Claims and/or the acts and circumstances relating thereto. The Court finds that issuance of this permanent injunction is necessary and appropriate in aid of the Court's jurisdiction over the action and to protect and effectuate the Court's Final Judgment.  Any person found in contempt of this injunction will be subject to sanctions.  Any Releasee who must seek from the Court the compliance of this injunction is entitled to reimbursement of his or her or its attorneys' fees incurred as a result of seeking such compliance from the person or entity in violation of this injunction.

8.     **Enforcement of Settlement.**   Nothing in this Final Judgment shall preclude any action to enforce the terms of the Settlement Agreement.

9.     **Modification of Settlement Agreement.**   The Parties are hereby authorized, without needing further approval from the Court and without further notice to the Class, to agree to and adopt such amendments to, and modifications and expansions of the Settlement Agreement as are consistent with this Order and that do not limit the rights of Class Members under the Settlement Agreement.

10.     **Retention of Jurisdiction.**   The Court has jurisdiction to enter this Final Judgment. Without in any way affecting the finality of this Final Judgment, this Court expressly retains jurisdiction as to all matters relating to the administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Final Judgment, and for any other necessary purpose, including, without limitation:

A.     enforcing the terms and conditions of the Settlement Agreement and resolving any disputes, claims or causes of action that, in whole or in part, are related to or arise out of the Settlement Agreement and this Final Judgment (including, without limitation, whether claims or causes of action allegedly related to this case are or are not barred by this Final Judgment, etc.);

B.     entering such additional orders as may be necessary or appropriate to protect or effectuate the Court's Final Judgment approving the Settlement Agreement, dismissing all claims on the merits and with prejudice, and permanently enjoining Class Members and Releasors and anyone acting on their behalf or for their benefit from initiating or pursuing related proceedings, or to ensure the fair and orderly administration of this settlement; and

C.    entering any other necessary or appropriate orders to protect and effectuate this Court's retention of continuing jurisdiction; provided, however, that nothing in this paragraph is intended to restrict the ability of the parties to exercise their rights under the Settlement Agreement.

11.    **No Admissions.**  Neither this Final Judgment nor the Settlement Agreement (nor any other document referred to herein) nor any action taken to carry out this Final Judgment is, may be construed as, or may be used as an admission or concession by or against the Defendant, as to the validity of any claim or any actual or potential fault, wrongdoing or liability whatsoever, or as to the certification of the Class herein for litigation purposes.  Entering into or carrying out the Settlement Agreement, and any negotiations or proceedings related to it, shall not in any event be construed as, or deemed evidence of, an admission or concession as to the Defendant's denials or defenses and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative agency or other tribunal for any purpose whatsoever, except as evidence of the settlement or to enforce the provisions of this Final Judgment and the Settlement Agreement; provided, however, that this Final Judgment and the Settlement Agreement may be filed in any action against or by the Defendant or Releasees to support a defense of *res judicata*, collateral estoppel, release, waiver, good-faith settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion or similar defense or counterclaim.

12.    **Capitalized Terms.**  Capitalized terms used in this Order but not defined shall have the meaning ascribed to them in the Settlement Agreement.

13.    **Dismissal of Action and Immediate Appeal.**  The Court determines this Order is a Final Judgment as to all claims in this case.  This Action, and all individual and Class claims

resolved in it, are hereby DISMISSED ON THE MERITS AND WITH PREJUDICE against Plaintiffs and all other Class Members.

14.    **CAFA Compliance.** The Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA"), requires that certain federal and state governmental officials be given notice of a proposed class action settlement.  Defendant gave CAFA notice to Attorney Generals of the fifty (50) states.   This Court finds that the Defendant's notice obligations under CAFA, and specifically 28 U.S.C. § 1715(b), have been satisfied and any notice required thereunder has been provided.

It is hereby **ORDERED, ADJUDGED** and **DECREED** that **FINAL JUDGMENT** is hereby entered this 10th day of October, 2013.

_____

**UNITED STATES DISTRICT JUDGE**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re: SOUTHWEST AIRLINES                    )          Case No. 11 C 8176
VOUCHER LITIGATION                           )

MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The Court previously approved a class-wide settlement in this action.  *See In re Southwest Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013).  After plaintiffs moved for attorney's fees, costs, and incentive awards, the Court granted the motion in part, reducing plaintiffs' requested fee amount and awarding plaintiffs' counsel fees in the amount of $1,332,206.25 and $18,522.32 in expenses. *See In re Southwest Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 5497275 (N.D. Ill. Oct. 3, 2013).  The Court thereafter entered final judgment.  Plaintiffs' attorneys then filed a motion under Federal Rule of Civil Procedure 59(e) to alter or amend the final judgment.  The Court held a hearing on the motion in June 2014.  This decision concerns that motion.  Familiarity with the Court's settlement approval and fee petition decisions is assumed.  For the following reasons, the Court grants plaintiffs' motion and increases the fee award, but not to the extent plaintiffs seek.

**Background**

The plaintiffs in this case brought a class action lawsuit against Southwest Airlines over its decision to stop honoring drink vouchers it had provided to travelers who purchased premium-priced "Business Select tickets."  The settlement permitted each class member to submit a proof of claim form and supporting documentation in

order to receive one replacement drink voucher for each unredeemed drink voucher.

After consenting to the settlement, Southwest agreed after mediated negotiations not to

oppose a fee request by plaintiffs of up to $3,000,000.  Plaintiffs' counsel submitted a

motion for fees in that amount.  Counsel worked backward from that amount to propose

two methods for calculating their fees to equal $3,000,000.  First, counsel contended

that the Court could award the $3,000,000 based on a percentage of the settlement—in

this case, 10.3 percent of what counsel considered the minimum value of the settlement

($29 million).  Secondly, under the lodestar method, counsel proposed hourly rates for

the five individuals who worked on the case:  $585 for Joseph Siprut, $325 for James

McClintick, $325 for Aleksandra M.S. Vold, $225 for Gregg Barbakoff, and $150 for

Kristina Pearson.  Counsel said they worked 2899.2 hours on the case, a figure

including 222 prospective hours "through the end of this litigation."  Counsel then

proposed a multiplier of 2.63, which brought the total to nearly $3,000,000.  Pls.' Mot.

For Attys.' Fees at 12–13.

Both before and after counsel submitted their motion for fees, several class

members filed objections both to the settlement and to the agreed-upon fee maximum.

Some objectors also argued that the Class Action Fairness Act (CAFA), 28 U.S.C.

§ 1712, governed the settlement, that the fee request was disproportionate to the class

recovery, and that the Court should not award fees until it learned how many drink

vouchers were redeemed as a result of the settlement.  *See, e.g.*, Gregory Markow's

Obj. to Class Settlement, docket no. 105; Obj. to Class Action Settlement by Jonathan

E. Fortman & Notice of Intention to Appear, docket no. 107; Notice of Obj. to the

Settlement (Daniel Sibley), docket no. 116.

The Court agreed with the objectors that CAFA applied to the attorney's fee award and precluded an award based on the value of unredeemed replacement coupons. But the Court also concluded that CAFA permits use of the lodestar method to determine class counsel's fees. In applying the lodestar method, the Court noted that "[t]he fee petitioner carries the burden of persuasion" on whether class counsel's submitted hourly rates are reasonable. *See In re Southwest*, 2013 WL 5497275, at *8 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010)).

Given that burden, the Court observed that although the claimed number of hours did not appear to be excessive, plaintiffs' counsel offered "rather scanty" evidence in support of the hourly rates they sought. *Id.* at *9. Counsel had submitted an affidavit stating their various rates but "offer[ed] nothing to indicate . . . that the attorneys have charged and obtained these rates for similar litigation, or indeed for any litigation." *Id.* Counsel had also presented a table of large law firms' billing rates, but "offer[ed] no support . . . for the proposition that these rates involve similar work done in similar cases. In fact, the contrary is likely true." *Id.*

Possessing little other evidence from plaintiffs' counsel tending to establish the propriety of the requested rates, the Court reviewed published fee awards from other cases, in particular those awarded to another Chicago firm with an established practice in consumer class action litigation. Judges had previously approved lower hourly rates than those requested in this case, for attorneys with, in some situations, significantly greater experience than plaintiffs' attorneys have. The Court also noted that lead attorney Siprut had not described his level of experience, prompting the Court to do

3

Internet research to ascertain the number of years he had practiced as an attorney.[1]

The Court also drew on other cases over which it had presided and had adjudicated fee

petitions and concluded that "the rates proposed by plaintiffs in the present case

significantly exceed the market rate—at least absent further support, which plaintiffs

have not offered." *Id.* at *10.

Using this data, the Court determined that the appropriate hourly rate for Siprut

was $425, and it found rates of $275, $225, and $200 appropriate for the other, less-

experienced plaintiffs' attorneys in the case.  The Court also approved a $125 rate for

counsel's paralegal.  Given the number of hours the attorneys submitted, the Court

calculated counsel's lodestar amount to be $888,137.50.  The Court also rejected

counsel's proposed multiplier of 2.63, awarding a multiplier of 1.5 for reasons described

in detail in the Court's written ruling.  Applying the multiplier to the lodestar, the Court

awarded $1,332,206.25 in attorney's fees to plaintiffs' counsel.

In their motion asking the Court to reconsider the fee award, plaintiffs' counsel

contend that the Court failed to give sufficient deference to the parties' settled-upon

figure and that the Court should not have considered certain evidence without providing

plaintiffs' counsel a chance to respond to it.  After filing the motion to reconsider,

plaintiffs' counsel filed additional evidence, including an expert report as well as detail

on certain cases in which plaintiffs' attorneys had previously been paid the hourly rates

---

[1] Plaintiffs' counsel correctly point out that they did, in fact, provide a firm resume with
their fee petition, a document the Court did not mention in its prior opinion.  However,
this document, which counsel provide again with their motion to reconsider, still does
not list the information the Court was actually seeking—the number of years of
experience of lead attorney Siprut.  Counsel do not argue in their motion that the Court
erroneously determined their levels of experience; thus it appears that the information
that the Court cited from Siprut's LinkedIn profile regarding his number of years as an
attorney was correct.

they seek here.  In addition, counsel argue that the Court should add 500 more hours of work to the lodestar amount to compensate counsel for future work, given that an appeal of the settlement was filed in September 2013.

### Discussion

Plaintiffs' attorneys have moved the Court to alter its judgment under Rule 59(e). To prevail on such a motion, "a party must clearly establish (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment."  *Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012) (internal quotation marks omitted).  The Seventh Circuit has defined "manifest error" as "the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (internal quotation marks omitted).  A Rule 59(e) motion "is not a fresh opportunity to present evidence that could have been presented earlier."  *Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 770 (7th Cir. 2013).  In other words, Rule 59(e) "certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment."  *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996).

### A.    Hourly rate

In their motion, plaintiffs argue that the Court in its prior decision did not accord sufficient deference to the requested fee amount, to which the parties had agreed after negotiations.  Plaintiffs also argue that the Court's "*sua sponte* reliance on evidence outside the record" was improper "without providing Plaintiffs with notice or an opportunity to respond."  Pls.' Mot. to Alter or Amend Final Judgment at 1.  This

5

evidence, plaintiffs maintain, "was far less persuasive than the evidence that Plaintiffs could have provided and *did* in fact provide." *Id.* at 2.

Plaintiffs are incorrect that the Court is required to accord "heightened deference" to their proposed fees solely because Southwest agreed to them. Pls.' Mot. to Alter or Amend Final Judgment at 7. In the Seventh Circuit, "[i]t is the fee applicant's burden to establish his or her market rate; if the applicant fails, the district court may make its own rate determination." *Johnson v. GDF Inc.*, 668 F.3d 927, 933 (7th Cir. 2012); *see also In re Southwest*, 2013 WL 5497275, at *8. District courts are permitted to "adjust the amount up or down to take into account various factors regarding the litigation." *Mathur v. Bd. of Tr. Of S. Ill. Univ.*, 317 F.3d 738, 742 (7th Cir. 2003). "A district court is certainly empowered to reduce a fee request sua sponte, and indeed it has an independent obligation to scrutinize the legitimacy of such a submission." *Jaffee v. Redmond*, 142 F.3d 409, 416 n.2 (7th Cir. 1998) (internal quotation marks omitted). Furthermore, when it comes to class actions, a court must "give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (collecting cases).

For the proposition that there is a "requirement of heightened deference" toward agreed-upon fee amounts, Pls.' Mot. to Alter or Amend Final Judgment at 7, plaintiffs cite four out-of-circuit district court cases. None of these cases states that courts are *required* to award agreed-upon fees, and even if they did, they are not binding on this Court. *See Rossi v. Proctor & Gamble Co.*, Civil Action No. 11-7238, 2013 WL 5523098, at *10 (D.N.J. Oct. 3, 2013); *Snell v. Allianz Life Ins. Co. of N. Am.*, No. Civ.

6

A65

97-2784, 2000 WL 1336640, at *19 (D. Minn. Sept. 8, 2000); *Manners v. Am. Gen. Life Ins. Co.*, No. Civ.A. 3-98-0266, 1999 WL 33581944, at *28 (M.D. Tenn. Aug. 11, 1999); *In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, MDL No. 901, 1992 WL 226321, at *4 (C.D. Cal. June 10, 1992). Furthermore, it is difficult to agree with statements in plaintiffs' cases that a negotiated fee amount between class counsel and a defendant is a "market-set price" or "at arm's length." *See Rossi*, 2013 WL 5523098, at *10; *Manners*, 1999 WL 33581944, at *28. As the Court will discuss below, a settled-upon fee amount between a defendant and a class counsel who has already obtained a settlement for a class is not a market rate. The Court therefore disagrees with plaintiffs' argument that "the Court must start with the presumption that the fees should be approved unless they are completely unreasonable." Pls.' Mot. to Alter or Amend Judgment at 8. That is not the law, given the Seventh Circuit's description of the district courts' independent obligation to scrutinize proposed fee awards.

In support of their initial fee petition, plaintiffs submitted one affidavit attesting to their counsel's hourly rates, accompanied by three attachments. The Court previously noted that this evidence was "rather scanty," *In re Southwest*, 2013 WL 5497275, at *9, and thus the Court had little choice but to look to other evidence given plaintiffs' counsel's failure to meet their burden to support their requested rates. *See Johnson*, 658 F.3d at 933. To satisfy a plaintiff's burden of justifying a proposed rate, an attorney may not simply submit "self-serving affidavit[s]" to substantiate her market rate. Rather, the attorney is "required to present some evidence, other than [the attorney]'s affidavit, that the requested rates were the market rates for someone of [the attorney]'s experience." *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 556 (7th Cir. 1999); *see*

*also Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) (fee applicant must "produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with" prevailing market rate).

However, plaintiffs have now filed with this court additional evidence in support of their requested hourly rates. This includes affidavits from lead attorney Siprut's clients about his hourly rates, documents from other cases he has settled, and settlement approvals and affidavits from cases and attorneys plaintiffs contend are similar. Plaintiffs have also submitted the declaration of Colin B. Weir, an economist who states that the hourly attorney rates plaintiffs' attorneys seek are market-based and similar to or lower than those of comparable firms.

Plaintiffs' attorneys contend that they would have offered this evidence if they had "known that the Court planned to invoke" the evidence it cited in its earlier opinion. Pls.' Mot. to Alter or Amend Final Judgment at 11. There is support for this argument. As the Seventh Circuit recently noted, "[a] district court may strike billing entries so long as the party requesting fees has an opportunity to respond to any objections." *Montanez v. Simon*, No. 13-1692, 2014 WL 2757472, at *6 (7th Cir. June 18, 2014). In *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 652 (7th Cir. 2011), the Seventh Circuit reversed a district court's reduction of a party's requested fee amount in part because the court "based its significant fee reduction on several rationales that plaintiff did not have the opportunity to respond to." The district court in *Pickett* approved a lower hourly rate than plaintiff's counsel requested based partly on its consideration of the Consumer Price Index and the Laffey Matrix but did not give plaintiff's counsel a chance to respond to use of these measures in calculating his hourly rate. "[E]ven

8

A67

though the district court has the discretion to rely on these measures," the Seventh

Circuit reasoned, "the district court should have given the parties the opportunity to

debate the strengths and weaknesses of applying these measures in this particular

case." *Id.* at 648.  Because "[t]he parties had no notice that they should address the

CPI or the Laffey Matrix in their briefing," "the court did err by relying on these measures

without giving plaintiff an opportunity to respond." *Id.* at 651.

The Seventh Circuit has used this rationale in other fee cases as well.  In *Spellan*

*v. Bd. of Educ. for Dist. 11*, 59 F.3d 642, 646 (7th Cir. 1995), the court recognized both

the burden of the party seeking fees to justify the amount requested and the district

court's obligation to scrutinize the request.  Nonetheless, the court reversed the district

court's fee award decision, because the district court utilized independent judicial

scrutiny of the record but failed to give plaintiff's counsel "an adequate opportunity to

respond to the district court's critique of the submitted petition." *Id.* at 646.  Specifically,

the district court decided to award fees much lower than those plaintiffs requested,

finding on its own investigation "that the plaintiffs had devoted themselves to

unsuccessful pursuits and that there had been duplication of effort as well as other

excessive billings." *Id.* at 642.  The Seventh Circuit held that if a district court's own

investigation leads it "to question certain aspects of the petition that have not been

questioned previously by the opposing party, the party submitting the petition ought to

have the opportunity to address the concerns of the district court before a final ruling is

made on the matter." *Id.*

Plaintiff's counsel in this case did not initially support its fee petition with more

than a "self-serving affidavit."  *Spegon*, 175 F.3d at 556.  Given the reasoning in *Pickett*

and *Spellan*, however, the Court likely should have given plaintiffs an opportunity to respond to the evidence the Court relied upon in its initial rejection of their requested hourly rate in their fee petition before making a final ruling. Although plaintiffs do not now present "new evidence" to justify granting their motion for reconsideration, in the sense that the evidence was not previously available, the Court "fail[ed] to recognize controlling precedent." *Oto*, 224 F.3d at 606. This omission provides sufficient reason to grant plaintiffs' motion to reconsider.

Having agreed to reconsider its prior ruling, the Court must now examine the evidence plaintiffs have provided with their reconsideration motion. As the Court discussed in its prior order on this fee petition, a reasonable hourly rate is "derived from the market rate." *Johnson*, 668 F.3d at 933. Also, "the district court's discretion in determining what is a reasonable attorney's fee applies to its determination of what constitutes a market." *Montanez*, 2014 WL 2757472, at *4 (internal alterations and quotation marks omitted).

The bulk of plaintiffs' evidence concerns plaintiffs' counsel's successful fee petitions in other cases, overwhelmingly in class action settlements. As plaintiffs note in their disclosures to the Court in connection with the hearing on this motion, many of these amounts were not formally opposed by defendants, because they were arrived at after negotiations. Plaintiffs' conclusion, along with that of Weir, their declarant, that these rates represent "market rates" is off the mark. The relationship between parties participating in a class action settlement is not akin to a litigant seeking counsel in the marketplace for legal services, where the litigant confronts a wide range of choices of attorney, and thus a range of potential fee arrangements. In contrast, the choices

10

A69

available to a defendant in a class action settlement are severely limited.  Opposing

counsel represent the only party with whom it is possible to negotiate.  The defendant

can choose to pay plaintiffs' counsel their requested rate, attempt to negotiate with them

over that rate, or else contest the matter before the court.  The defendant certainly has

no choice on whom it deals with and numerous incentives to pay its opponent's lawyer

more than it otherwise might simply to buy peace.  In a recent case, the Seventh Circuit

affirmed a fee ruling by a judge who similarly discounted the probative value of hourly

rates that were "were based on compromises between parties" and instead looked

elsewhere for evidence of an actual market-based rate.  *Montanez*, 2014 WL 2757472,

at *5.

Also, the defendant's options to negotiate with plaintiff's counsel on their

requested rate or contest the matter before the court require the defendant to incur

additional and unwelcome attorney's fees for lawyers to work on the fee dispute.  In

sum, all of these scenarios suggest an element of duress or at least a gravely

constricted set of choices.  The Court therefore declines to consider plaintiffs' evidence

of successful settlement fee petitions as evidence of plaintiffs' counsel's market rate.

That said, the Court agrees with plaintiffs that the hourly rates plaintiffs' counsel

have actually collected from paying clients is significant evidence of market rates for

their services.  Plaintiffs state that they have actually collected the following paid hourly

rates from clients in three cases in the years 2013 and 2014 for the following attorneys

who worked on this matter:  $585 for lead attorney Siprut, and $285 per hour for

associate Gregg Barbakoff, for whom plaintiffs request a $225 hourly rate in their

petition.  The fact that clients have paid plaintiffs' counsel these rates for hourly work is

presumptive proof that these are market rates for these attorneys.  *See Montanez*, 2014 WL 2757472, at *4 ("The best evidence of the market rate is the amount the attorney actually bills for similar work.").  The Court therefore concludes that the above-mentioned rates are appropriate for use in plaintiffs' counsel's lodestar calculation for attorneys Siprut and Barbakoff.[2]

However, two of the attorneys who worked on this case, Aleksandra M. S. Vold and James McClintick, did not work on the cases in which plaintiffs' counsel received actual paid hourly rates.  In Siprut's original affidavit, Vold is described as "a third-year attorney," with a requested hourly rate of $325, and McClintick is described as "an attorney with seven years of experience," also with a requested rate of $325.  Affid. of Joseph J. Siprut ¶¶ 15–16 [docket no. 103-1].  Plaintiffs do not provide any explanation for why Vold, who from plaintiffs' filings has a similar if not identical level of experience to Barbakoff, warrants a rate $40 per hour higher than Barbakoff has previously received in an actual case with paying clients, and $100 more per hour than plaintiffs request for Barbakoff now.  The Court concludes that an hourly rate of $285 for Vold is reasonable, considering that Barbakoff has billed for and received that rate in a prior case.  As for attorney McClintick, who appears to have at least double the years of experience of Vold, the requested rate of $325 appears reasonable, especially

---

[2] Much or most of the work associated with this case occurred prior to the years in which Siprut and Barbakoff received paid hourly rates from clients (2011 and 2012 versus 2013 and 2014).  However, it is appropriate to use an attorney's current hourly rate in calculating a lodestar amount.  *See Mathur*, 317 F.3d at 744–45 ("We have allowed district courts to use either current rates or past rates with interest when calculating the lodestar amount, because either method provides 'an adjustment for delay in payment which is an appropriate factor in the determination of what constitutes a reasonable attorney's fee.'"  (quoting *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989)) (internal alterations omitted)).

considering the fact that plaintiffs' counsel's firm has previously billed $450 per hour for Melanie K. Nelson, an attorney with thirteen years of experience.

The Court also notes that even after several submissions and affidavits related to this motion, that plaintiffs have not submitted support for the $150 hourly rate they request for their paralegal, Kristina Pearson.  The Court therefore declines to disturb its earlier reduction of the hourly rate for Pearson from $150 to $125.  *See In re Southwest*, 2013 WL 5497275, at *10.

The Court previously determined the number of hours plaintiffs' counsel requested in this case is reasonable.  Based on these findings, the lodestar amount totals $1,099,412, calculated as follows:

- Siprut:  $542,880 (928 hours at $585 per hour)

- McClintick:  $179,367.50 (551.9 hours at $325 per hour)

- Vold:  $286,624.50 (1005.7 hours at $285 per hour)

- Barbakoff:  $87,390 (388.4 hours at $225 per hour)

- Pearson:  $3150 (25.2 hours at $125 per hour)

## B.    Multiplier

As noted in the Court's prior order, plaintiffs sought a multiplier of their lodestar amount of 2.63.  In its prior order on plaintiffs' fee petition, the Court awarded a multiplier of 1.5.  The Court found that the 2.63 number was "excessive" and "artificial," considering that it was "evidently chosen because, based on the lodestar counsel initially proposed, it would result in the requested $3,000,000 fee award."  *In re Southwest*, 2013 WL 5497275, at *12.  The Court also considered the following factors in determining the multiplier:  "relative lack of complexity; a success whose actual value

13

was modest; the vindication of a public interest; and the risk of an effective defeat if class certification were denied." *Id.*

In their motion to reconsider, plaintiffs stated that they disagreed with the Court's chosen multiplier, but "[we]re not asking the Court to revisit that issue under Fed. R. Civ. P. 59(e)." Pls.' Mot. to Alter or Amend Final Judgment at 1 n.1. However, at the June 2014 hearing on the motion, although plaintiffs did not discuss the multiplier directly, they urged the Court to accept the overall fee amount of $3,000,000. Even at their requested rates, it would be impossible to get to this number without a multiplier higher than the 1.5 the Court already awarded, which plaintiffs stated they were notchallenging. Plaintiffs appeared to be arguing at the hearing that the Court was required to defer to the $3,000,000 amount because the parties agreed to it after negotiation. Yet courts do not award overall amounts when deciding fee petitions on the basis of the lodestar method; they first determine whether an attorney's requested number of hours and hourly rate are appropriate, which together compose the elements of the lodestar calculation. Further, as noted above, the out-of-circuit district court cases plaintiffs cite for the notion that agreed-upon fee amounts require judicial deference do not discuss the courts' "independent obligation to scrutinize the legitimacy of such a submission." *Jaffee*, 142 F.3d at 416 n.2. Nor do they contemplate the fee petitioner's burden to produce satisfactory evidence supporting the requested rate. *Pickett*, 664 F.3d at 640.

In sum, the Court has already made a determination that a multiplier of 1.5 is proper in this case. Plaintiffs have not provided a basis to alter that determination.

Considering the multiplier of 1.5, the Court concludes that plaintiffs are entitled to

14

A73

$1,649,118 ($1,099,412 multiplied by 1.5).

## C.    Projected attorney time for appeal

Plaintiffs' counsel also argue that the Court should add an additional 500 hours to their lodestar calculation because class member Markow has appealed the settlement to the Seventh Circuit.  Plaintiffs' counsel say that when the Court issued its October 2013 order on fees in this case, they "did not anticipate an appeal and thus did not include any 'anticipated' hours relating to an appeal."  They now "conservatively estimate[ ]" that 500 more hours will be necessary to litigate the appeal, which should feature "complicated issues."  Pls.' Mot. to Alter or Amend Final Judgment at 19. Plaintiffs' attorneys say that this appeal represents "new evidence" requiring the Court to modify its earlier judgment.  *Id.*

Plaintiffs' counsel likely contend the appeal is "new evidence" under the standard for motions for reconsideration under Rule 59(e).  They have no persuasive argument for why the prospect of an appeal—a fairly predictable event, after all, particularly when the matter was contested as this one was—should be considered "new evidence" that warrants reconsideration.

The Court therefore declines to alter its judgment to provide for projected appellate fees.  If plaintiffs are successful on appeal, they are permitted to petition this Court for additional fees.  The Seventh Circuit has in the past permitted parties to seek attorney's fees in the district court for a successful appeal.  *See, e.g.*, *A. Bauer Mech., Inc. v. Joint Arbitration Bd.*, 562 F.3d 784, 793 n.3 (7th Cir. 2009) ("[T]he appellees may file an application in the district court, within 14 days of this judgment, for the reasonable fees, costs, and expenses incurred in this appeal."); *Cange v. Stotler & Co.*, 913 F.2d

A74

1204, 1211 (7th Cir. 1990) (noting that district court's fee award "properly included compensation for work done on the first appeal"); *Bond v. Stanton*, 630 F.2d 1231, 1236 (7th Cir. 1980) (remanding case "for entry of an appropriate award of attorney's fees to plaintiffs for their appellate work on the merits and for their efforts in litigating the fee question"); *cf. Jannotta v. Subway Sandwich Shops, Inc.*, 225 F.3d 815, 819 (7th Cir. 2000) (holding it was not abuse of discretion for district court to deny fees to party for defense of appeal); *Bandura v. Orkin Exterminating Co., Inc.*, 865 F.2d 816, 823 (7th Cir. 1988) (awarding appellate attorney fees and remanding case to district judge "to determine the amount of work expended on this appeal").

### Conclusion

For the foregoing reasons, the Court grants in part plaintiffs' motion to alter or amend [docket no. 173].  The Court's order of October 3, 2013 awarding plaintiffs' attorney's fees and expenses is amended to provide that plaintiffs' counsel are awarded attorney's fees in the amount of $1,649,118 and expenses in the amount of $18,522.32.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 20, 2014

16

A75